**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JOHN MURPHY,

                          Plaintiff,

      v.                                     1:17-cv-628
                                           (TJM/TWD)

NEW YORK STATE PUBLIC EMPLOYEES
FEDERATION, et al.,

                          Defendants.


_____

**Thomas J. McAvoy, Sr. U.S.D.J.**


**DECISION & ORDER**

      Before the Court is Defendants' motion for summary judgment in this case alleging

disability discrimination in employment. <u>See</u> dkt. # 26. The parties have briefed the

issues and the Court will decide them without oral argument.

**I.    BACKGROUND[1]**

      This case arises out of Plaintiff John Murphy's employment with Defendant New

York State Public Employees Federation ("PEF"). Plaintiff claims that Defendants

discriminated against him because of his disability and retaliated against him for

complaining about that discrimination. PEF is a union that represents around 54,000

professional, scientific, and technical employees of the State of New York. Defendants'

_____

[1]Defendants filed the Statement of Material Facts with citations to the record
required by Local Rule 7.1(3) and Plaintiff filed a response. <u>See</u> L.R. 7.1(3). The Court
will cite to the Defendants' Statement for facts which are uncontested and note the extent
and source of Plaintiff's disagreement with those facts.

Statement of Material Facts Not in Dispute ("Defendants' Statement"), dkt. # 26-1, at ¶ 1.

Defendant Wayne Spence has served as PEF's President since August 1, 2015. Id. at ¶

2. Defendant Christopher Leo began serving as PEF's Chief of Staff at the time Spence

became President. Id. at ¶ 3. Leo chaired Spence's transition team. Id. at ¶ 3. Leo had

previously worked as a PEF lobbyist from 2011 to 2014. Id. Defendant Todd Kerner, an

attorney, joined PEF from the New York State Department of Taxation and Finance at the

same time that Leo returned to the Union. Id. at ¶ 4. He previously served several terms

on PEF's Executive Board. Id. Defendant Gregory Amorosi, who previously held political

jobs in the New York State Legislature and worked as an attorney, became Legislative

Director for PEF in late September 2015. Id. at ¶ 6. He was Plaintiff's direct supervisor

from the time Amorosi joined PEF until December 4, 2015. Id. at ¶ 6. Defendant Jennifer

Seamon has worked for PEF since 2005. Id. at ¶ 7. She became Human Resources

Administrator in 2013. Id. Her job is not supervisory and she has no power to terminate

employees. Id. She did not supervise the Plaintiff and was not involved in the decision to

fire him. Id.

Plaintiff began working for PEF in 2005. Id. at ¶ 8. During his employment with the

Union, he held the position of Political Lobbyist/Organizer. Id. at ¶ 9. His job

responsibilities included tracking and monitoring federal legislation applicable to PEF and

its members. Id. at ¶ 10. He served as an at-will employee. Id. at ¶ 11.

On August 2, 2014, Plaintiff was involved in a motor-vehicle accident. Id. at ¶ 20.

Plaintiff and his mother both notified PEF about this accident. Id. at ¶ 21. Plaintiff e-

mailed then-PEF-President Susan Kent and Executive Director Dan Steen to let them

know of the accident. Id. Plaintiff was unable to work, and PEF granted him a leave of

absence.  Id. at ¶ 22.  Plaintiff alleges that the accident caused a traumatic brain injury, as well as injuries to his back, spine and neck.  Id. at ¶¶ 23-24.  The accident, Plaintiff contends, also gave him double and triple vision, which required him to wear special glasses with prisms to read and write.  Id. at ¶ 25.

In August or September 2014, Plaintiff provided PEF with a note from Seton Health, dated August 4, 2014, stating that Plaintiff "'is suffering from injuries due to a motor vehicle accident and is disabled from work.'"  Id. at ¶ 26.  The note did not describe any specific injuries.  Id. at ¶ 27.  Later in August or September 2014, Plaintiff gave PEF another note from Dr. Charles M. Sulzman of Troy Internal Medicine.  Id. at ¶ 28.  This note stated that "'Mr. Murphy was seen today in medical follow-up of injuries sustained in [a] recent accident.  He remains disabled from work and will be re-evaluated on September 2nd.'"  Id.  Sulzman was Plaintiff's primary doctor.  Id. at ¶ 29.  The note does not describe any specific injuries.  Id. at ¶ 30.  The note became part of Plaintiff's personnel file.  Id.

Plaintiff sent Susan Kent an email on August 21, 2014 to ask what steps Plaintiff needed to take to resume his employment.  Id. at ¶ 31.  Kent forwarded the e-mail to then-Executive Director Dan Steen.  Id.  Steen responded that Plaintiff needed only keep the Union informed of his status.  Id.  He would also need a note from a doctor releasing him to work when he was ready to return.  Id.  Plaintiff was aware leave was available under the Family and Medical Leave Act ("FMLA") but did not request any such leave.  Id. at ¶ 32.  PEF permitted Plaintiff to use his accrued paid leave while out with his injuries, and he was thus paid during that period.  Id. at ¶ 33.  No one at PEF interfered with or objected to Plaintiff's right to take leave after his injuries.  Id. at ¶¶ 34-35.

Plaintiff provided PEF with a note from his doctor clearing him to return to work on a part-time basis on or about September 2, 2014. Id. at ¶ 36. PEF added the note to his personnel file. Id. Defendant Jennifer Seamon (formerly Jennifer Tropiano) emailed Plaintiff on September 15, 2014, asking for a medical release from his physician and requesting that he identify any limitations he faced or reasonable accommodations he needed when he returned to work. Id. at ¶ 37.

Plaintiff testified that he needed certain accommodations to perform his job when he returned to PEF on a part-time basis. Id. at ¶ 38. He related that he needed time to walk around the parking lot every few hours for 5-15 minutes during the work day. Id. He needed to wear special prism glasses to read and write. Id. Defendants contend that no record exists of Plaintiff "discussing or documenting his need for accommodations" with PEF. Id. Plaintiff disputes that he failed to inform PEF of his need for accommodations. See Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's Response"), dkt. # 33, at ¶ 38. He contends that he informed Seamon of his needs. Id.[2]

Plaintiff began attending physical therapy appointments after his accident. Defendants' Statement at ¶ 39. Dr. Craig Nelson provided chiropractic physical therapy. Id. No one at PEF prevented Plaintiff from attending his physical therapy appointments. Id. at ¶ 40. PEF permitted Plaintiff to work on a reduced schedule after his return. Id. at ¶ 41. He began by working one day a week and then added another day at a time until he

_____

[2]In a declaration opposing Defendants' motion, Plaintiff claims that "I informed Human Resources (Defendant [Seamon]) that I needed to take frequent breaks, that it would take me longer to finish my work, and that I would need to attend frequent medical appointments. These accommodations were approved and I continued to work with the accommodations." See Plaintiff's Declaration, dkt. # 30, at ¶ 26.

worked five-day weeks.  Id. at ¶ 41.  Plaintiff agrees that "[n]o one at PEF interfered with, or otherwise gave Plaintiff a hard time about, working a reduced part-time schedule following his accident."  Id. at ¶ 42.

Plaintiff did not provide any additional medical documentation after he returned to work full-time in March 2015.  Id. at ¶ 44.  At that time, he began working full days, from 10 a.m. to 6 p.m., five days a week.  Id. at ¶ 45.  He continued to take periodic breaks and wear prism glasses.  Id. at ¶ 46.  Plaintiff did not request any intermittent leave for a continuing medical condition after his return.  Id. at ¶ 47.

A new administration, headed by Defendant Wayne Spence as Union President, took over the PEF on August 1, 2015.  Id. at ¶ 50.  Spence claims that he "began holding staff accountable for their job performing [sic] and terminated employees who were not performing at a satisfactory level."  Id. at ¶ 53.[3]  Defendants Leo and Kerner assumed new roles as well.  Id. at ¶ 51.  Defendants claim that on Defendant Leo's first day as Chief of Staff Plaintiff approached Leo and asked for aid in obtaining a new laptop.  Id. at ¶ 52. Plaintiff had been having trouble obtaining a device, but Defendants assert that Leo solved this problem within a few days.  Id.  Plaintiff contends that he had a laptop, which he used to work outside the office.  Plaintiff's Response at ¶ 52; Plaintiff's Declaration at ¶ 61.  Moreover, Plaintiff asserts, the laptop Leo found for him was encrypted, and he could not use it outside the office.  Plaintiff's Declaration at ¶ 61.

_____

[3]Plaintiff disputes this claim, pointing out that "Spence provides no examples of such employees."  Plaintiff's Declaration at ¶ 69.  "As of the time of my termination," Plaintiff claims, "I was not aware of a single employee who was summarily discharged as I was without any progressive discipline or warnings nor has PEF produced any evidence to suggest that any other employees were terminated under such circumstances."  Id.

The parties agree that Plaintiff had "resolved" many of the physical issues that he suffered by August of 2015. Defendants' Statement at ¶ 54; Plaintiff's Declaration at ¶ 36. Plaintiff claims, however, that though he was able to work full-time, he "continued to suffer from cognitive problems with concentration, and other residual issues resulting from the car accident." Plaintiff's Declaration at ¶ 36. He needed to take "frequent breaks" and needed time "to attend medical appointments[.]" Id. He was still "suffering from [his] traumatic brain injury and other residual problems with [his] spine, [his] eyes, and [his] head (frequent headaches)." Id. Plaintiff agrees that in August 2015, "other than need[ing] periodic breaks and wearing glasses to read and write," he had "no other restrictions on his ability to perform his job duties." Defendants' Statement at ¶ 55. He attended physical therapy once a week. Id. at ¶ 56.

Defendants claim that between August 1, 2015 and December 4, 2015, Plaintiff never discussed his medical condition with anyone at PEF. Id. at ¶ 57. Plaintiff denies this statement, pointing out that he had informed Defendant Gregory Amorosi about his need for accommodations. Plaintiff's Response at ¶ 57. Moreover, he contends, while he may not have raised his medical condition with Defendant Leo, Leo frequently discussed "medical issues and disabilities" in his presence. Id. Plaintiff points to the "Charge of Discrimination" he filed with the Equal Employment Opportunity Commission ("EEOC") on April 21, 2016. There, he alleged that in August 2015 Leo began "to make comments to me about my car accident, suggesting that I was not really hurt." See Exh. 5 to Plaintiff's Declaration, dkt. # 30-5. Leo, Plaintiff claims, stated that he was aware of Plaintiff's car accident because "I saw your file and medical stuff and now I have access to all salaries and all of your e-mails." Id. Plaintiff further alleges that "Chris Leo repeatedly made

comments about my need to attend physical therapy." Id. He contends that Leo told him that "I used to make fun of people with disabilities all the time, does that bother you?" Id. "On other occasions," Plaintiff claims, "he stared directly at me and stated: 'I don't like handicapped people.'" Id. After Leo moved Plaintiff to another office in September 2015, he told him that Plaintiff's new office served "to isolate [him] so '[he] would not have access to the officers who think you are so great and impressed because of your car accident.'" Id. In phone conversations, Plaintiff alleges, Leo "would scream at me, use derogatory language such as calling me 'handicapped' or 'disabled,' or use offensive language such as calling me 'retarded.'" Id.

Plaintiff informed Amorosi that he needed to attend physical therapy appointments. Defendants' Statement at ¶ 58. Amorosi approved Plaintiff's attendance at the appointments. Id. The parties disagree about whether Plaintiff informed Amorosi about his medical condition and disabilities and whether the physical therapy was an accommodation to his condition. Defendants' Statement at ¶ 59; Plaintiff's Response at ¶ 59.

Plaintiff began his career with PEF working in the Union's Legislative Office on State Street in Albany, New York. Defendants' Statement at ¶ 60. At some point, PEF's then-legislative director, Pat Lavin, transferred Plaintiff to PEF's headquarters in Latham, New York. Id. at ¶ 61. Defendants assert that Lavin had Plaintiff transferred "because he would not take direction from her." Id. at ¶ 62. Plaintiff disputes this claim, contending that his transfer came because he had been assigned additional duties better handled in Latham, as well as a promotion and a pay increase. Plaintiff's Response at ¶ 62; Plaintiff's Declaration at ¶ 44. His personnel file, he asserts, contains no evidence on the

7

reason for his transfer. Plaintiff's Declaration at ¶ 44.

In September 2015, the new presidential administration, via Defendant Todd Kerner, began moving employee's offices in the Latham headquarters in an attempt to address space limitations. Defendants' Statement at ¶ 63. Kerner had hoped to move one employee, Jackie Henderson, to an office near Plaintiff's in Latham. Id. at ¶ 64. Kerner discussed the move with Henderson, who told him she preferred to stay in her current location. Id. at ¶ 65. She explained that she had previously been in a relationship with Plaintiff and would not feel comfortable working near him; she felt threatened by his behavior after they broke up. Id. at ¶ 67. Henderson accused Plaintiff of driving up and down her street and eavesdropping on her conversations. Id. She did not, however, want to raise a formal complaint about Plaintiff. Id. at ¶ 68. Instead, she hoped to keep her office where it was. Id. Kerner informed President Spence of these allegations, and Spence decided the best course of action would be to move Plaintiff's office back to the Legislative Staff Office in Albany, where he had previously worked. Id. at ¶¶ 69-70.

Defendants allege a series of problems and deficiencies with Plaintiff's performance in the Legislative Office. They contend that he frequently complained to legislative staff about the administration Spence began to lead in September 2015. Id. at ¶¶ 71-77. Plaintiff allegedly made disparaging comments "on a near daily basis." Id. at ¶ 81. Plaintiff's complaints to his coworkers eventually made their way to his superiors, including Leo and Spence. Id. at ¶¶ 84, 86-90. Kerner found such comments "particularly troubling . . . because it was inappropriate for a staff member such as Plaintiff to complain to elected officials on the Executive Board." Id. at ¶ 91. Plaintiff denies making disparaging statements. Plaintiff's Response at ¶¶ 70-91, 93.

8

Defendants also allege deficiencies in Plaintiff's work performance from September 2015 until his firing on December 4, 2015. Defendants' Statement at ¶ 94. Leo and Kerner complained that Plaintiff did not produce a volume of work suitable for his position. Id. at ¶¶ 95, 97. Officials also complained about the work hours Plaintiff kept, finding that he rarely appeared in the office, and that when he appeared he came between 2:30 and 3:30 p.m. and left before 7 p.m. Id. at ¶¶ 99-100. Plaintiff appeared not to follow the status of the federal legislation his job required him to monitor. Id. at ¶ 101. Plaintiff denies that he had any issues with his work performance or was difficult to locate during the work day. Plaintiff's Response at ¶¶ 94-101.

Eventually, Defendants Leo, Kerner, and Amorosi "decided to hold a counseling meeting with Plaintiff." Defendants' Statement at ¶ 102. They allege that they informed Spence about their planned meeting, explaining that "there had been issues with Plaintiff regarding insubordination, failing to follow directions, and issues related to his work product." Id. at ¶¶ 103-104. Defendants contend that President Spence himself had "observed Plaintiff acting in an insubordinate manner." Id. at ¶ 105. They also allege that Spence, aware of Plaintiff's negative comments about his administration and the one that preceded it, attempted to prevent Plaintiff from attending Executive Board meetings out of a desire to prevent him from spreading negative messages about the Union's leadership. Id. at ¶¶ 106-109. Despite a direction from Leo not to attend Executive Board meetings, Plaintiff did so anyway. Id. at ¶ 110. Displeased with Plaintiff's presence at the meeting, Spence told Leo to "address" Plaintiff's behavior. Id. at ¶ 111. Spence also knew of Plaintiff's allegedly poor performance, Defendants assert. Id. at ¶ 112. Plaintiff denies that he engaged in any of the alleged conduct and asserts that he stopped attending

Executive Board meetings when told not to.  Plaintiff's Response at ¶¶ 104-110.

When told of the proposed counseling session, President Spence allegedly asked Kerner and Leo "why they were bothering to counsel Plaintiff at all[.]"  Id. at ¶ 113.  He instead suggested that the Union terminate Plaintiff's employment based on his conduct.  Id.  Defendants allege that Leo and Kerner instead felt they should continue to work with Plaintiff.  Id. at ¶ 115.  They hoped to use the meeting to "counsel" Plaintiff and convince him to address his behavior; they contend that they never discussed Plaintiff's need to attend physical therapy appointments.  Id. at ¶¶ 116-118.

The meeting in question took place on December 3, 2015.  Id. at ¶ 119.  Amorosi called Plaintiff and directed him to report to the PEF's Latham headquarters for a meeting.  Id. at ¶ 119.  Defendants allege that Amorosi told Leo before the meeting started that he had asked Plaintiff where he was most of the workweek.  Id. at ¶ 120.  Defendants claim that Plaintiff "mentioned that he was attending physical therapy appointments."  Id.  The parties disagree about whether Leo had previously been aware of Plaintiff's accident or that he had any type of medical condition.  Id. at ¶ 121.  Plaintiff disputes that Leo did not know of his physical difficulties; he alleges that Leo "repeatedly made fun of my vision problems, made fun of my cane and my difficulty walking, and ability to concentrate."  Plaintiff's Declaration at ¶ 28.  He also contends that Leo was aware of his traumatic brain injury, "and called me 'retarded.'"  Id.  Such comments, Plaintiff insists, came "throughout the fall of 2015 well before the December 2015 meeting."  Id.  Those comments continued even after Plaintiff's transfer to the Legislative Office, since Leo made frequent visits every week to that facility.  Id.

The meeting began at approximately 4:15 p.m.  Id. at ¶ 126.  Defendant Jennifer

10

(Tropiano) Seamon took notes of the meeting, a practice Defendants claim was common in such settings. Id. at ¶¶ 122-124. Plaintiff denies that the notes are accurate. Plaintiff's Response at ¶ 127. The parties disagree about what Plaintiff had been doing before the afternoon meeting. Defendants claim that Plaintiff at first claimed he came to the meeting immediately after he finished his physical therapy, but changed his story after being confronted with records at his deposition that indicated his appointment ended several hours before the meeting. Id. at ¶ 125. Plaintiff, they allege, "suddenly remembered" that he had a conference call after his appointment. Id. Plaintiff contends this allegation misstates his testimony. Plaintiff's Response at ¶ 125. He contends that he could not recall what he did during the day, but "I believe I had a conference call or two and I also recall having an issue with my phone and therefore I had to go to the store to address that issue." Plaintiff's Declaration at ¶ 64. He wore a track suit that day because "I had attended physical therapy earlier that day and did not change because I was not expecting to be called into a meeting without notice." Id.

When Plaintiff arrived at the meeting, he asked "'what's this all about, I want to know what this is about, what's going on?'" Defendants' Statement at ¶ 127. Defendants contend he "repeatedly" asked these questions. Id. The parties disagree about the subject of the meeting. Defendants claim that Leo "took the lead" and attempted to address Plaintiff's "speaking out in ways [he] should not be[,]" asking him about several comments he allegedly made. Id. at ¶¶ 128-131. Plaintiff contends that "[t]he focus of the meeting was that Board members had noticed that plaintiff was mistreated, that plaintiff's duties had changed, and that Board members were speaking out in support of plaintiff." Plaintiff's Response at ¶¶ 128-131.

The parties agree that Leo questioned Plaintiff about the time he spent in physical therapy. Defendants' Statement at ¶ 132. Defendants' claim Leo had only just found out about his need for physical therapy and that his questions simply amounted to an attempt "to try and find out how often Plaintiff was attending physical therapy." Id. at ¶ 133. As explained above, Plaintiff contends that Leo was well aware of his physical limitations; Leo's interest in those appointments, Plaintiff claims, led him to cancel several appointments. Plaintiff's Response at ¶ 133; Plaintiff's Declaration at ¶ 31. Defendants also contend that Leo was unaware of Plaintiff's alleged disability at the time he asked his questions. Defendants' Statement at ¶ 134. Plaintiff denies this claim, citing in part to the evidence related above. Plaintiff's Response at ¶ 134.

Defendants claim that Plaintiff failed to answer questions about his physical therapy, citing to the notes that Defendant Seamon prepared. Defendants' Statement at ¶ 137. Instead, he claimed that Leo's questioning amounted to "bullying." Id. Plaintiff alleges that Leo made several comments "disparaging" his physical therapy during the meeting and admits that he described Leo's conduct as "bullying." Plaintiff's Response at ¶ 137. He contends that Leo "question[ed] whether he actually worked or just attended physical therapy all day." Id. Plaintiff denies that he refused to answer questions. Id. He used "that opportunity to lodge a formal complaint of discrimination" and alleges that his complaint caused Defendant Kerner "to immediately end the meeting." Id.

At the meeting, Leo and Kerner asked Plaintiff about the negative comments he had allegedly been making about the new Union administration. Id. at ¶ 138. Plaintiff contends that Leo and Kerner asked him not about his comments on the Union leadership, but about "why people were speaking out concerning Chris Leo's treatment of

me." Plaintiff's Declaration at ¶ 11. Plaintiff contends that, though "people [were] noticing and are speaking out," he had not encouraged them to do so. Id. Defendants allege that Kerner informed Plaintiff during the meeting that he had been "insubordinate," and had spoken negatively about President Spence and Chris Leo to members of the executive board. Defendants' Statement at ¶ 140. Plaintiff denies that Defendants accused him of insubordination at the meeting. Plaintiff's Declaration at ¶ 7. Instead, he contends, the meeting focused on complaints by board members and other PEF members that his duties had changed. Id.

Kerner also asked Plaintiff about his complaints that Leo had kept his "hands tied," that he "[couldn't] do anything." Defendants' Statement at ¶ 142. Plaintiff does not deny that he claimed that Leo had tied his hands, but asserts that he made that claim in the context of explaining that Leo had limited his job duties, which "made it difficult for him to do his job properly." Plaintiff's Response at ¶ 143. Defendants contend that Plaintiff referenced field representatives in complaining about limits to his duties, and that Leo responded by telling Plaintiff that he did not "have contact with them." Defendants' Statement at ¶¶ 143-144. Leo, Defendants claim, then demanded that Plaintiff "describe your duties here to me . . . other than physical therapy? I am saying this because nobody has had the guts to confront you prior . . . you can't take direction." Id. at ¶ 144. Plaintiff denies mentioning or hearing comments about field representatives, he admits however, that "Leo repeatedly asked about what plaintiff did at work except attend physical therapy." Plaintiff's Response at ¶ 144.

Defendants contend that Leo asked his question about Plaintiff's work habits "because he had heard that Plaintiff was not in the office and that he wanted to confront

Plaintiff about where he was all the time." Defendants' Statement at ¶ 145. They contend

that Leo was unaware of Plaintiff's disability at that point. Id. at ¶ 146. Plaintiff disputes

these statements. Id. at ¶¶ 145-146. He avers that:

> During this meeting Chris Leo made several disparaging statements about plaintiff attending physical therapy visits, and questioning whether he actually worked or just attended physical therapy all day. Plaintiff explained that it was exactly this type of conduct that had plaintiff and other PEF members upset. Plaintiff did not refuse to answer questions, though, he did state that Chris Leo had and continued to bully and harass him. Plaintiff decided to take that opportunity to lodge a formal complaint of discrimination, which caused Executive Director, defendant Todd Kerner, to immediately end the meeting.

Id. at ¶ 145. Leo also questioned Plaintiff about comments to Executive Board members

that Leo was "out to get" Plaintiff, that Leo had limited Plaintiff's authority, and prevented

him from attending a meeting in Washington, D.C. Defendants' Statement at ¶ 147. Leo

allegedly informed Plaintiff that "[l]et me tell you, that if you talk negatively, then that is

insubordination . . . insubordination is talking down to anyone higher or above you[.]" Id.

at ¶ 148. Plaintiff points to these sorts of statements as evidence of Leo's "bullying and

harassment" of him, contending that the only discussions he had with Board members

came because people noticed Defendants' alleged "mistreatment" of Plaintiff. Plaintiff's

Declaration at ¶¶ 8, 11.

Defendants claim that Leo informed Plaintiff of problems "regarding his work

product and whether he was providing detailed reports and assessments of his work."

Defendants' Statement at ¶ 149. Plaintiff denies that Leo raised these issues at the

meeting. Plaintiff's Response at ¶ 149. Defendants contend that, while Greg Amorosi had

not asked plaintiff to give detailed reports and assessments, "Chris Leo had expected

Plaintiff to prepare these types of reports because Plaintiff would sit in on federal

14

conference calls and Amorosi was still learning about federal legislation." Defendants' Statement at ¶ 150. Plaintiff contends that "[t]here was no discussion during the December 2015 meeting about detailed reports or lack of communication. In fact, Greg Amorisi stated that I had provided him with the necessary information on federal issues." Plaintiff's Declaration at ¶ 53.

Defendants contend that, after this discussion, Plaintiff told the meeting that "Members are mad[.]" Defendants' Statement at ¶ 151. Kerner allegedly responded to that statement by exclaiming "What you just said! How would you know? How would you know that?" Id. Plaintiff denies making this statement. Plaintiff's Response at ¶ 151. The parties agree that Leo then informed Plaintiff that he would be required to "document your work, every minute of [your] day, including physical therapy." Defendants' Statement at ¶ 152. Defendants contend that Leo made this request "because of the concerns regarding Plaintiff not being in the office and because Leo wanted to know what he was doing during the day." Id. at ¶ 153. Plaintiff contends that this demand represents another example of Leo's discrimination towards him because of his disability. Plaintiff's Response at ¶ 153.

Defendants allege that Kerner then warned Plaintiff that "you could be removed today, you are 'at will' . . . we are all 'at will employees . . . seriously? I'm shocked at this! I could get permission to fire you." Defendants' Statement at ¶ 154. Plaintiff denies that Kerner made that statement, and instead contends that Defendants "told [him] repeatedly he would not be fired." Plaintiff's Response at ¶ 154.

As the meeting went on, Defendants allege, they continued to confront Plaintiff about his supposed criticism of the Union leadership. Defendants' Statement at ¶¶ 155-158. They allegedly presented him with an email from Paula Hennessy, Director of

15

Training and Education, Health and Safety under a previous union president, about inappropriate "discussion with staff about PEF business." Id. at ¶ 158. Defendants claim that Leo told Plaintiff that the email represented concerns about how Plaintiff "act[ed] as an employee, how [he spoke] with subordinates . . . [and] bosses." Id. at ¶ 159. Plaintiff denies that he was accused of insubordination or confronted with inappropriate statements at this meeting. Plaintiff's Response at ¶ 155-159. He contends that Defendants never confronted him with Hennessy's email. Id. at ¶¶ 158-159.

Defendants claim that Leo then informed Plaintiff that he would not be fired that day, but that "we are going to re-evaluate you in 30 days, your work ethics [sic], your time and attendance[.]" Defendants' Statement at ¶ 160. Leo warned that "in that period if I hear one, just one staff member, eboard member, regional coordinator, CSEA . . ." Id. Defendants contend that Plaintiff interrupted at that point, asking "CSEA?" Id. Plaintiff denies that Leo ever informed him of a 30-day probation or evaluation. Plaintiff's Response at ¶ 160. He alleges that "Chris Leo did not state that I would be placed on a 30 day probation or evaluation. I was told I would not be terminated; but that changed quickly after I lodged a formal complaint of discrimination." Plaintiff's Declaration at ¶ 57.

Defendants further allege that about that time in the meeting, PEF Statewide Vice President Peter Banks walked by the glass room in which the meeting was taking place. Defendants' Statement at ¶ 161. Defendants allege Plaintiff looked at Banks and shrugged his shoulders, "as if to indicate he had no idea why he was there." Id. Plaintiff's alleged shrug angered Kerner: "in complete awe at Plaintiff's behavior after having just sat through a counseling session regarding insubordination," Kerner exclaimed, "There it is! John! Seriously?" Id. at ¶ 162. Plaintiff describes that event differently. Plaintiff's

16

Response at ¶ 161.  He admits that he saw Banks during the meeting.  Id.  Plaintiff

"shrugged his shoulders and gestured that he did not know what the meeting was about."

Id.  He claims he "was justifiably nervous and upset about the manner in which he was

being questioned and about how he was treated by Chris Leo[.]"  Id.  According to Plaintiff,

Leo, not him, had engaged in "inappropriate and offensive behavior[.]"  Id.  He further

contends that he had not been accused of insubordination during the meeting.  Id. at ¶

162.

Defendants contend that Kerner then ended the meeting with Plaintiff.  Defendants'

Statement at ¶ 164.  Greg Amorosi considered Plaintiff's conduct at the meeting "over the

top disrespectful"; he thought Plaintiff's behavior should lead to his termination.  Id. at ¶

165.  After the meeting, Kerner, Leo, Amorosi, and Ed Aluck met in Kerner's office.  Id. at

¶ 166.  Kerner contended that Plaintiff was not receptive to the counseling he had been

offered in the meeting.  Id.  Kerner pointed to Plaintiff's behavior during the meeting and

his interaction with Banks.  Id.  Kerner argued that Plaintiff was unprofessional and should

be terminated.  Id. at ¶ 167.  He also did not believe that Plaintiff's contributions to the

organization were meaningful.  Id. at ¶ 168.  Defendants allege that Leo likewise

considered Plaintiff's behavior during the meeting as insubordinate, but did not advocate

his termination.  Id. at ¶ 169.  Defendants contend that Leo left the meeting and went back

to his office.  Id.

Defendants contend that after meeting in Kerner's office, Kerner and Ed Aluck met

with President Spence and shared their opinions with him.  Id. at ¶ 170.  Citing to

Spence's deposition, Plaintiff claims that Leo also attended this meeting.  Plaintiff's

Response at ¶ 169.  He quotes Spence to "recall a conversation after the counseling

17

session where Todd Kerner, Chris Leo and Ed Aluck came back to me and said we need to terminate him. He's been insubordinate. It didn't go well." Id. In any case, Defendants contend, Spence decided that Plaintiff should be placed on administrative leave and then terminated. Defendants' Statement at ¶ 171. Spence relied on the same reasons he had stated before the meeting for desiring Plaintiff's termination. Id. Defendants insist that only Spence had the authority make the decision to terminate an employee. Id. at ¶ 172. Plaintiff contends that the evidence indicates that his termination came at the urging of Kerner, Leo, and Aluck. Plaintiff's Response at ¶ 171.

After meeting with Spence, Kerner and Aluck put Plaintiff on administrative leave. Id. at ¶ 173. Leo was not present when they took this action. Id. at ¶ 174. PEF terminated Plaintiff on December 4, 2015. Id. at ¶ 175. Leo was not present at that meeting either. Id. at ¶ 176.

Plaintiff filed a three-count Complaint in the Supreme Court of Saratoga County, New York on May 15, 2017. See Complaint ("Complt"), dkt. # 1-1. Defendants removed the case to this Court. See dkt. # 1. Count 1 alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. Count 2 alleges disability discrimination in violation of the New York Human Rights Law ("NYHRL"), N.Y. Exc. Law §§ 290, et seq. Count 3 alleges Defendants interfered with Plaintiff's leave and retaliated against him for taking leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq.

The parties engaged in discovery. Defendants filed the instant motion at the close of the discovery period. The parties then briefed the issues, bringing the case to its present posture.

18

## II. LEGAL STANDARD

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III. ANALYSIS

Defendants offer several grounds for summary judgment. The Court will discuss

Defendants' arguments in turn.

### A. ADA/NYHRL

#### i. Legal Standard

Plaintiff brings various claims under the Americans with Disabilities Act. He alleges that he was a victim of employment discrimination because of his disability. The ADA bars discrimination against a "qualified individual [with a disability] on the basis of disability" in the "terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). To "establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because his disability." Brady v. Wal-Mart Stores, 531 F.3d 127, 134 (2d Cir. 2008). "Under the last element, a plaintiff must show that the adverse employment action 'took place under circumstances giving rise to an inference of discrimination.'" Davis v. New York City Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).

Courts analyzing claims of employment discrimination under the ADA follow the burden-shifting framework set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the "plaintiff must initially come forward with facts sufficient to establish a *prima facie* case that his discharge was effected under circumstances giving rise to an inference of discrimination." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). Once plaintiff meets his burden, "the burden

of production then shifts to the defendant, who must proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination" created when plaintiff makes out a prima facie case.  Id.  If the employer makes out this burden to "articulate an explanation that, if true, would connote lawful behavior," the burden then returns to "the plaintiff to persuade the factfinder that the employer's proffered explanation is merely a pretext for unlawful discrimination."  Id.

The same standard applies to disability discrimination claims against an entity under both the ADA and the NYHRL.  See Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) ("In discrimination claims brought under the New York State and New York City Human Rights Laws, the burden-shifting framework established by the Supreme Court in McDonnell Douglas . . . applies.").

### ii. PEF

#### a. Discrimination

##### 1. *Prima Facie* Case

Defendants first argue that Plaintiff cannot make out a *prima facie* case for employment discrimination under the ADA.  They insist that Plaintiff cannot demonstrate that he has a disability.  The proof, they contend, does not support a claim that his injuries from the motor vehicle accident in question substantially limited a major life activity, as required by the statute.

Under the ADA, a disability is: "(A) a physical or mental impairment that substantially limits one or more major activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. §

12102(1)(A-C).  Proof of a disability is part of a plaintiff's *prima facie* case under the ADA.

Parada v. Banco Indus. de Venez., 753 F.3d 62, 68 (2d Cir. 2014).  A disability includes

"'a physical or mental impairment that substantially limits one or more major life activities

of such individual[.]"  Id. (quoting 42 U.S.C. § 121202(1)(A)).  "[A]n impairment

'substantially limits' a major life activity if the impaired person is '[s]ignificantly restricted as

to the condition, manner or duration under which [he] can perform' the activity."  Id. at 69

(quoting 29 C.F.R. § 1630.2(j)(1)(ii)(1991)).[4]

The court's inquiry into the limitations of a plaintiff's impairment "reject[s] bright-line

tests and instead emphasize[s] the need for fact-specific inquiry."  Id.  A "plaintiff must first

show that [he] suffers from a physical or mental impairment."  Weixel v. Bd. of Educ. of

N.Y., 287 F.3d 138, 147 (2d Cir. 2002).  Next, "plaintiff must identify the activity claimed to

be impaired and establish that it constitutes a 'major life activity.'"  Id.  "Third, the plaintiff

must show that [his] impairment 'substantially limits' the major life activity previously

identified."  Id.  This test, however, is not especially onerous.  Federal regulations require

that "'[t]he term 'substantially limits' shall be construed broadly in favor of expansive

coverage, to the maximum extent permitted by the terms of the ADA' and 'is not meant to

---

[4]For the statute's purposes, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The ADA directs courts that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."  42 U.S.C. § 12102(4)(A).  "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as–" certain medical devices and medication, including "low-vision devices (which do not include ordinary eyeglasses or contact lenses[.]" 42 U.S.C. § 12102(4)(E)(I). "[L]ow vision devices" are "devices that magnify, enhance, or otherwise augment a visual image."  42 U.S.C. § 12102(4)(E)(IV)(iii)(II).

be a demanding standard.'" <u>Parada</u>, 753 F.3d at 68, n.3 (quoting 29 C.F.R. § 1630.2(i)(1)(i)).  As such, "'[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" <u>Id.</u> (quoting 29 C.F.R. § 1630.2(i)(1)(ii)).

Defendants argue that Plaintiff was not disabled at the relevant time because he suffered from a temporary medical condition which was not substantially limiting after he returned to work.  At the time in question, Defendants insist, no evidence indicates that Plaintiff suffered any substantial limitation to a major life activity.  Plaintiff worked a full schedule at PEF, Defendants point out, as well as part-time work as a toll collector for the New York State Thruway Authority.  The only limitations on his ability to work were a requirement that he take short breaks throughout the day and that he wear special glasses to read and write.  "In light of the fact that Plaintiff was working two separate jobs, what appears to be seven days a week, uninhibited by any restrictions," Defendants argue, "there can be no legitimate claim that he was limited in his ability to work as compared to most people in the general population."  Defendants admit that Plaintiff needed special "prism glasses" to read and write, but argue that his ability to review and synthesize complicated federal legislation, work collecting tolls, and read and respond to emails "suggest that his limitation was not substantially limiting."

Plaintiff contends that his automobile accident caused him lasting injury that substantially limits major life activities.[5]  He points out that his accident caused him to miss a month of work and limited him to part-time employment for an additional six months.  He

---

[5]Plaintiff also asserts that Defendants perceived him as disabled, but does not expand on this argument.

23

suffered a traumatic brain injury, spine injury, vision problems, chronic injuries, and injuries to his wrist, arms, and legs. He could not walk without a walker or cane, and could see only with specially ordered prism glasses. Even with his glasses, Plaintiff had vision limitations, and "his ability to concentrate, think, read, write, and learn were very much affected." He had difficulty sleeping and continues to suffer from "chronic spine, vision, and neurological problems associated with his traumatic brain injury."

The Court finds that sufficient–if barely sufficient–evidence exists for a jury to conclude that Plaintiff's automobile accident led to injuries that, at the time of his termination, substantially limited him in performing major life activities. First, Plaintiff points to a number of physical and mental impairments that followed on his accident.[6] Next, Plaintiff testified that he suffers from frequent and chronic pain that limits him in major life activities. He has trouble concentrating, thinking, writing and learning. Plaintiff cannot simply sit at a desk and work, but requires frequent movement during the day because of his intractable pain. He cannot read without special glasses. Plaintiff requires frequent physical therapy to be able to maintain his ability to work. Taken as a whole and

---

[6]Federal regulations define physical and mental impairments as:

(1) [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or
(2) [a]ny mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). The evidence is sufficient for the Court to conclude that Plaintiff has met his burden of demonstrating a physiological disorder or condition of the neurological and muscoloskeletal system.

with the understanding that the threshold for disability under the amended ADA is not an "onerous one," a reasonable juror could conclude that Plaintiff's physical condition substantially limited him in the major life activities of seeing, sleeping, learning, reading, concentrating, and working.[7]

Defendants also challenge that portion of Plaintiff's *prima facie* case that alleges that he suffered an adverse employment action. Defendants do not deny that they terminated his employment, but contend that no evidence supports his claim that the termination was the product of discrimination because of his disability. The question here is whether Plaintiff has sufficient evidence to permit a jury to conclude that the circumstances of his termination permit an "'inference of discriminatory intent.'" Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 231 (2d Cir. 2015) (quoting Maraschiello v. City of Buffalo Police Dept., 709 F.3d 87, 92 (2d Cir. 2013)).

Defendants argue that no evidence indicates that they terminated Plaintiff because of his disability. To meet this part of the burden-shifting test, the Plaintiff must show that "[he] suffered [an] adverse employment action because of [his] disability." Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004). To meet this part of his *prima facie* case, Plaintiff must show 'that discrimination was the 'but-for' cause of [his] termination." Mancini v. Accredo Health Group, No. 3:17-CV-01625-MPS, 2019 U.S. Dist. LEXIS 149981 at *15 (D. Conn. Sept. 4, 2019) (citing Natofsky v. City of New York, 921 F.3d 337,

─────────────────────

[7]The amendments to the ADA establish that "major life activities no longer need to be of central importance'" to finding the existence of a disability. Anderson v. Nat'l Grid, PLC, 93 F.Supp.3d 120, 133 (E.D.N.Y. 2015) (quoting D'Entremont v. Atlas Health Care Linen Servs., Co., LLC, No. 12-CV00060 (LEK/RFT), 2013 U.S. Dist. LEXIS 34474 at *6 (N.D.N.Y. Mar. 13, 2013)).

346 (2d Cir. 2019)).  Courts have defined "but-for" causation as evidence that discrimination "was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  Kwan v. Andalex Grp., LLC, 737 F.3d 834, 845 (2d Cir. 2013).  At the same time, "'but-for' causation does not require proof that [discrimination] was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [discriminatory] motive."  Id. at 846.

Still, "as discrimination will seldom manifest itself overtly, courts must 'be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.'" Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (quoting Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464-65 (2d Cir. 1989)).  Courts "must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Id.  A court should not engage in "guesswork or theorization," and should recognize that "'an inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].'" Id. (quoting 1 Leonard B. Sand, et al, MODERN FEDERAL JURY INSTRUCTIONS, P 6.01, instr. 6-1 (1997)).  "Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all the circumstances."  Id.

The Court finds that the evidence in this case is sufficient to draw an inference of discrimination from the Defendants' conduct.  As explained above, Plaintiff alleges frequent comments from Leo about his absences from work, comments by Leo that he did not like people with disabilities, and references by Leo about his need for physical therapy

26

during the "counseling session" that immediately preceded his termination. He also

contends that he never faced complaints about his work before that session, and that Leo

had made other comments concerning his physical condition in the time leading up to the

session. While the parties dispute Leo's role in Plaintiff's termination, a reasonable juror

could find he played an important role in that decision. Under those circumstances, a

reasonable juror could find an inference of discrimination in the circumstances of Plaintiff's

termination. That juror could conclude that Leo's criticism of Plaintiff always came in the

context of Plaintiff's disability, and therefore find Plaintiff's disability the "but-for" cause of

termination. The Court therefore finds that Plaintiff has met his burden of making out a

*prima facie* case of employment discrimination based on his disability.

### 2. Burden Shifting[8]

Since Plaintiff has made out his *prima facie* case, the question is whether

Defendants have provided sufficient evidence to meet their burden of providing a

legitimate, non-discriminatory reason for Plaintiff's termination. See Greenway, 143 F.3d

at 52. The Court finds that they have. The evidence related above indicates that

Plaintiff's supervisors found his attendance unreliable and his performance lacking.

Plaintiff was not in the office when he should have been, did not complete tasks as

assigned, did not respond to direction from supervisors, and did not perform lobbying in

the volume or in the manner his employers required. Supervisors also found that Plaintiff

had disparaged the Union's new leadership and attempted to undermine that leadership's

authority. Firing an employee for insubordination and performance issues represents a

---

[8]Neither side offers argument concerning these issues. Since the legal standard
here requires applying the *McDonnell-Douglas* test, the Court will do so.

legitimate non-discriminatory reason for Defendants' employment decision, and the Court finds that Defendants have advanced such a reason for their employment decision. Plaintiff does not dispute that Defendants have met their burden in this respect.

The burden now shifts to the Plaintiff to point to evidence a jury could use to conclude that the stated reasons for the employment decision were not the real ones, but were instead pretext for Defendants' real, discriminatory, motive. Id. Plaintiff argues that his *prima facie* case of discrimination supports his claim in this respect as well. The evidence cited above indicates that Defendants, particularly Leo, had complaints about Plaintiff's need for physical therapy and that Leo expressed disdain for people with "handicaps." A reasonable juror could examine such evidence, weigh the fact that Plaintiff had not faced discipline for his conduct before the "counseling session," and conclude that the stated reasons for Plaintiff's termination were not the real reasons. That juror could find that Defendants Plaintiff's disability was a but-for cause of his termination. The Court will therefore deny the Defendants' motion in this respect.

**b.    Harassment**

Plaintiff next alleges that he was the victim of harassment because of his disability. The Second Circuit has recently concluded "claims for hostile work environment are actionable under the ADA." Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019). "'Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—' it follows that disabled Americans should be able to assert hostile work environment claims under ADA, as can those protecte by Title VII under that statute[.]" Id. (quoting Fox v. Gen.

Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001)).

"Harassment is actionable when it creates a hostile work environment which is 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [plaintiff's] employment where thereby altered.'" Farina v. Branford Bd. of Educ., 458 Fed. Appx. 13, 17 (2d Cir. 2011) (quoting Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)). "A plaintiff must show not only that [he] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010). In deciding whether evidence supporting a hostile work environment claim exists, the court must "look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance[.]'" Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (internal citations omitted)). "For conduct to be frequent, '[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Marino v. EGS Elec. Group, LLC, No. 12cv518(JBA), 2014 U.S. Dist. LEXIS 43131 at *18 (Dist. Conn. Mar. 31, 2014) (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (internal citations omitted)). "'Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim. Nor can offhand comments, isolated incidents, stray remarks, or [the plaintiff's] subject belief constitute a viable claim.'" Cadet v. Deutsche Bank Secs., Inc., No. 11 Civ. 7964 (CM), 2013 U.S. Dist. LEXIS 87328 at *24 (S.D.N.Y. June 18, 2013) (quoting Payton v. City Univ. of New York, 453 F.Supp.2d 775,

29

785 (S.D.N.Y. 2006)).

As explained above, Plaintiff argues that evidence of harassment includes statements by Leo, changes in job duties, and other "derogatory statements" about him. He contends that these statements came while both he and Leo worked in the same building and after his transfer. Plaintiff admits he would see Leo less frequently after that transfer. After considering the evidence summarized above, the Court finds that no reasonable juror could find that Leo's comments were continuous and concerted, and thus pervasive. Though a juror could find Leo's comments unprofessional and demeaning, no evidence indicates that they were continual, that Plaintiff endured them regularly, or that they changed the terms and conditions of his employment. Even if a juror found that Leo made every comment Plaintiff describes, a juror would still have to find that such comments were merely episodic. The Court will therefore grant the motion in this respect and dismiss Plaintiff's harassment claim.

### c. Retaliation

The ADA also prohibits an employer from "discriminat[ing] against any individual" who "has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 12203(a). "'Claims for retaliation [under the ADA] are analyzed under the same burden-shifting framework established for Title VII cases.'" Widomski v. State Univ. of N.Y., 748 F.3d 471, 476 (2d Cir. 2014) (quoting Tregila v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)). A *prima facie* case for retaliation under the ADA requires a showing that "'(1) the employee was

engaged in activity protected by the ADA, (2) the employer was aware of the activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action.'" Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999) (quoting Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 1999 U.S. App. LEXIS 15150 at *3 (2d Cir. 1999)). Courts apply the same standard to evaluate rehabilitation claims under the ADA and the NYHRL. Treglia, 313 F.3d at 719.

Defendants contend that Plaintiff cannot make out a *prima facie* case. Defendants first argue that no evidence exists to support Plaintiff's claim that he complained about harassment on the basis of disability at the December 3 counseling meeting. Plaintiff responds that he twice complained about discrimination, once to Greg Amorosi a few weeks before the December 3, 2015 meeting and then during the meeting. A plaintiff can protest discriminatory treatment in a number of "informal ways" beyond filing a formal complaint, such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990). Plaintiff insists that he complained about discrimination by Leo. Though defendants dispute the existence of these claims, particularly at the December 3 meeting, Plaintiff has raised a question of fact as to whether he engaged in a protected activity. The Court will deny the motion on those grounds.

Defendants also insist that Plaintiff cannot make out the second element of his *prima facie* case because the ultimate decision maker, Spence, was not aware of his

complaints. Courts have held that "to satisfy the knowledge requirement," nothing "more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity." Gordon v. New York City Board of Educ., 232 F.3d 111, 116 (2d Cir. 2000); see also, Kwan v. Andalex Grp., LLC, 737 F.3d 834, 844 (2d Cir. 2013) (without the corporate knowledge rule "a simple denial by a corporate officer that the officer ever communicated the plaintiff's complaint, no matter how reasonable the inference of communication, would prevent the plaintiff from satisfying her prima facie case, despite the fact that the prima case requires only a de minimis showing."). The facts related above indicate that at least Defendants Kerner and Aluck met with Spence following the meeting in which Plaintiff allegedly raised disability discrimination and recommended that Spence fire Plaintiff. Such conduct could be viewed by a reasonable juror as evidence that persons involved in the crucial meeting where Plaintiff raised disability discrimination, and that the two (at least) then almost immediately recommended Plaintiff's firing. A reasonable juror could view this as evidence that the decision-makers were aware of Plaintiff's complaints.

Defendants also in this respect contend that Plaintiff cannot establish the causation element of his prima facie case. A plaintiff can demonstrate a causal connection either "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" Littlejohn v. City of New York, 795 F.3d 289, 319 (2d Cir. 2015) (quoting Gordon, 232 F.3d at 117). Here, Plaintiff points to temporal proximity. In such cases, ""the causal connection . . . 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse

32

action[.]'" Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (quoting

Mancharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d

Cir. 1988) (finding that a gap between plaintiff's initial complaint and discharge was

sufficient to demonstrate a causal connection); see also, Gorman-Bakos v. Cornell Coop.

Extension, 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a plaintiff can indirectly

establish a causal connect to support a discrimination or retaliation claim" by showing

close temporal proximity."). Here, using the facts explained above, a reasonable juror

could believe that Plaintiff alleged discrimination on the basis of his disability during the

December 3 meeting. His firing came the next day. He claims to have heard repeated

complaints about his disability and his efforts to obtain accommodation for it. A

reasonable juror could use that conduct and that close temporal proximity to conclude that

Plaintiff's alleged complaint caused his firing. Sufficient evidence supports that element of

Plaintiff's *prima facie* retaliation case. See Littlejohn, 795 F.3d at 320 ("allegations that

[plaintiff's] demotion occurred within days after her complaints of discrimination" were

sufficient at the pleading stage).[9]

---

[9]Defendants also insist that Plaintiff must show that "but for" his protected activity, he would not have been terminated. "[T]here is an unsettled question of law in this Circuit as to whether a plaintiff must show, in order to succeed on [his] ADA retaliation claim, that the retaliation was a 'but for' cause of the adverse employment action or merely a motivating factor.'" Flieger v. E. Suffolk BOCES, 693 F.App'x 14, 18 (2d Cir. 2017) (citing Eisner v. Cardozo, 685 F.App'x 29, 30 (2d Cir. 2017)). Even applying that "but-for" test, however, "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive', nor does the but-for standard 'alter the plaintiff's ability to demonstrate causation . . . through temporal proximity.'" Genco v. Starpoint Cent. Sch. Dist. Bd. of Educ., No. 17cv1168, 2018 WL 3827740, at *7, n.7 (W.D.N.Y. June 4, 2018). Under these circumstances, the close temporal proximity of the complaint and Plaintiff's termination passes the but-for test.

Defendants further argue that no evidence demonstrates that Spence, who fired

Plaintiff, had any knowledge of the Plaintiff's protected activity. Without such knowledge,

Defendants insist, Plaintiff cannot demonstrate that Plaintiff's firing came because of his

protected activity. Plaintiff relies on a "cat's paw" theory to meet his burden here. As the

Second Circuit Court of Appeals has explained:

> The phrase derives from an Aesop fable, later put into verse by Jean de la
> Fontaine, in which a wily monkey flatters a native cat into pulling roasting chestnuts
> out of a roaring fire for their mutual satisfaction; the monkey, however, "devour[s] . .
> . them fast," leaving the cat "with a burnt paw and no chestnuts" for its trouble.
> "[I]njected into United States employment discrimination law by [Judge Richard]
> Posner in 1990," Straub v. Proctor Hosp., 562 U.S. 411, 415 n.1, 131 S. Ct. 1186,
> 179 L. Ed. 2d 144 (2011), the "cat's paw" metaphor now "refers to a situation in
> which an employee is fired or subjected to some other adverse employment action
> by a supervisor who himself has no discriminatory motive, but who has been
> manipulated by a subordinate who does have such a motive and intended to bring
> about the adverse employment action," Cook v. IPC Intern. Corp., 673 F.3d 625,
> 628 (7th Cir. 2012) (Posner, J.). Because the supervisor, acting as an agent of the
> employer, has permitted himself to be used "as the conduit of [the subordinate's]
> prejudice," Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 2011), that prejudice
> may then be imputed to the employer and used to hold the employer liable for
> employment discrimination. In other words, by merely effectuating or "rubber
> stamp[ing]" a discriminatory employee's "unlawful design," Nagle v. Marron, 663
> F.3d 100, 117 (2d Cir. 2011), the employer plays the credulous cat to the
> malevolent monkey and, in so doing, allows itself to get burned–i.e., successfully
> sued.

Vasquez v. Empress Ambulance Serv., 835 F.3d 267, 272 (2d Cir. 2016). The Second

Circuit has approved the use of the "cat's paw" theory in Title VII retaliation cases. Id. at

273. The "cat's paw" theory has also been applied in ADA retaliation cases. See

Saviano v. Town of Westport, No. 3:04-CV-522 (RNC), 2011 U.S. Dist. LEXIS 11 at *23-

25 (Dist. Con. Sept. 30, 2011). Under these circumstances, where Spence's firing of

Plaintiff came shortly after he raised a complaint about disability discrimination and where

a juror could find that the facts indicate that Plaintiff faced a discriminatory animus from

those who recommended his firing, even assuming Spence accepted the allegedly manufactured reasons for Plaintiff's termination without knowledge of the protected activity is not fatal to Plaintiff's claim.

Assuming that a but-for theory of causation applies, the Court finds that the evidence is sufficient for a reasonable juror to conclude that Plaintiff's disability was the "but-for" cause of his termination, and Plaintiff has satisfied his burden.   As further explained above, the application of the <u>McDonnell-Douglas</u> burden shifting test to this case creates a question of fact for the jury.  Defendants' motion will be denied in this respect as well.

### iii.    Individual Defendants[10]

Defendants also seek dismissal of any claims against the individual Defendants under the NYHRL.  That statute prohibits "an employer" from discriminating on the basis of "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status[.]" N.Y. Exec. L. § 296(1)(a).  Courts have concluded that "[a] supervisor is an 'employer' for purposes of establishing liability under the NYHRL if that supervisor 'actually participates in the conduct giving rise to [the] discrimination." <u>Feingold v. New York</u>, 366 F.3d 138, 157 (2d Cir. 2004).  As such, "[i]ndividual liability . . . may lie under the New York Human Rights Law where . . . the individual participates in the conduct giving rise to the

---

[10]The individual defendants cannot be liable under the ADA for disability discrimination.  <u>See, e.g.</u>, <u>Corr v. MTA Long Island Bus</u>, No. 98-9417, 1999 US App. LEXIS 25058, at * 5 (2d Cir. Oct. 7, 1999) ("[T]here is no right to recovery against individual defendants under the ADA.").  They also cannot be liable individually for retaliation.  <u>See</u> <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 79 (2d Cir. 2010).

discrimination claim." Kercado-Clymer v. City of Amsterdam, 2010 U.S. App. LEXIS 6129, 108 Fair Empl. Prac. Cas. 1785, at *5 n.1 (2d Cir. Mar. 25, 2010).  The NYHRL also provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  NY Exec. L. § 296(6).  Under this provision, "a co–worker who 'actually participates in the conduct giving rise to a discrimination claim'" can "be held liable under the NYHRL even though that co-worker lacked the authority to hire or fire the plaintiff." Feingold, 336 F.3d at 157-58 (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)).[11]  To be liable, "'the aider and abettor [must] share the intent or purpose of the principal actor.'" Griffin v. Sirva Inc., 835 F.3d 283, 293 (2d Cir. 2016) (quoting Idlisan v. NYS Dep't of Taxation & Fin., No. 12cv1787, 2013 U.S. Dist. LEXIS 83131, 2013 WL 2898050, at *4-5 (N.D.N.Y. June 13, 2013) (internal quotations omitted)).

The Court will examine the role of each of the individual defendants in the alleged discrimination in turn.

### i.    Christopher Leo

---------------------

[11]In Feingold, the court found that plaintiff had:

> presented sufficient evidence to create a triable question as to whether each of the named individual defendants 'actually participate[d]' in the conduct giving rise to Feingold's claim of unlawful discrimination in violation of the NYSHRL.  Feingold has proffered enough evidence to permit the conclusions (a) that Lee-Sang, Tapia, and Waltrous all participated in creating a hostile work environment, (b) that Waltrous and Isaacs assigned him a disproportionate workload because of his race, and (c) that Sullivan and Schugasser not only took no action to remedy such behavior although they were aware of it, but also terminated Feingold's employment on the basis of impermissible factors.

Feingold, 366 F.3d at 158.

Defendants assert that no evidence indicates that Leo played a role in Plaintiff's termination, and that the claims against him must therefore be dismissed. Plaintiff contends that Leo is liable because of his allegedly harassing and disriminatory behavior, and because he made the recommendation to Spence that Plaintiff be terminated.

The Court finds that a reasonable juror could use the conduct recited above to find Defendant Leo liable on an aiding and abetting theory. A juror could find that Leo held a discriminatory animus towards Plaintiff because of his disability based on his alleged comments to Plaintiff doubting his injuries, his alleged animus towards people with disabilities, and his supposed desire to isolate Plaintiff from co-workers who were more supportive of his situation. A reasonable juror could use this evidence to conclude that Leo's complaints about Plaintiff's performance to Spence came not because of Plaintiff's actual performance, but because of Leo's animus to Plaintiff because of his disability. The parties dispute whether Leo encouraged Spence to terminate him, and whether Leo was at the meeting where Spence came to that conclusion. The parties agree, however, that Leo was involved in discussions with Kerner, Amorosi, and Ed Aluck about how to handle Plaintiff's alleged insubordination and poor performance. In the context of Leo's alleged animus towards Plaintiff because of his disability, a reasonable juror could draw an inference that Leo used this situation to act on that animus. If a juror drew such an inference, that juror could find Leo liable for aiding and abetting discrimination. See, e.g., Malena v. Victoria's Secret Direct, LLC, 886 F.Supp.2d 349, 366-67 (S.D.N.Y. 2012) (denying summary judgment on NYSHRL claim against an individual defendant when "the corporate Defendants, knowingly or not, may have terminated Plaintiff *because* of discriminatory or retaliatory intent attributable to" the individual defendant) (emphasis in

original)).  Leo was also present when Plaintiff allegedly complained of discrimination.

The temporal proximity between that complaint, combined with Leo's alleged animus

towards Plaintiff because of his disability, is also sufficient for a reasonable juror to find

Leo liable for aiding and abetting retaliation.  The Court will therefore deny Defendants'

motion in this respect.

### ii.    Wayne Spence

Plaintiff asserts that Defendant Spence is liable under this theory because he made

the decision to terminate Plaintiff, following the recommendation of Leo and Kerner.   The

parties agree that Spence had responsibility to hire and fire employees at the union.  He

could be liable if he were to "'actually [participate] in the conduct giving rise to [the]

discrimination."  Feingold, 366 F.3d at 157.  Plaintiff does not point to any evidence,

however, indicating that Spence knew of Plaintiff's disability or acted because of

knowledge of that disability.  The evidence related above indicates that Spence raised

concerns about Plaintiff's alleged insubordination to the leadership of the PEF.  While

evidence indicates that those who urged Plaintiff's firing on Spence may have had an

animus to Plaintiff and acted together to terminate his employment, Plaintiff fails to point to

any evidence that Spence shared in this animus or knew it.  A reasonable juror could only

conclude that Spence fired Plaintiff because of his supposedly deficient performance.

Though the union can be liable under the NYHRL and the ADA, Spence may avoid

individual liability under New York law.  The Court will grant the motion in this respect.

### iii.    Todd Kerner

Defendants seek judgment on Plaintiff's claims against Defendant Todd Kerner.

They contend that no evidence exists of any animus by Kerner towards the Plaintiff because of his disability, and no evidence that he acted on such animus. Plaintiff argues that Kerner is liable because he recommended to Spence that Plaintiff be terminated.

The evidence related above indicates that Kerner recommended to Spence that the union terminate Plaintiff's employment. That evidence also indicates that Kerner's recommendation came because of Plaintiff's conduct and his supposed insubordination. Nothing indicates that Kerner had any concern about, knowledge of, or animus towards Plaintiff because of his condition in the time leading up to the December 3 meeting. At the same time, however, it is undisputed that Kerner heard Plaintiff complain about discrimination because of his disability at that meeting. He terminated the counseling meeting and shortly thereafter recommended to Spence that the union fire Plaintiff. As explained above, the close temporal proximity between Plaintiff's complaint and Kerner's recommendation to Spence could be used by a reasonable juror to find that Kerner's firing recommendation was motivated by Plaintiff's complaints about discrimination. The Court must therefore deny the motion in this respect as well.

### iv. Jennifer (Tropiano) Seamon

Defendants seek dismissal of any claims against Defendant Jennifer (Tropiano) Seamon. They argue that she was not involved in any decisions about Plaintiff's employment and that she lacked the authority to terminate anyone. As with the other Defendants, Plaintiff contends that a reasonable juror could find Seamon liable as an aider and abettor. He argues that, like Amorosi, Seamon is liable because she was "aware of plaintiff's complaints of discrimination but failed to take action to stop the behavior."

39

The Court finds that no evidence exists by which a reasonable juror could conclude that Defendant Seamon is liable under an aided and abetted theory. First, no evidence indicates that Seamon made any decisions about Plaintiff's employment or had any control over the conditions of his employment. Defendants' statement of material facts asserts that "Seamon did not supervise Plaintiff and was not involved in the decision to terminate his employment at PEF." Defendants' Statement at ¶ 7. Plaintiff does not dispute this claim. See Plaintiff's Response at ¶ 7. The facts related above indicate that Seamon played no role in Plaintiff's termination. She took notes during the meeting that led to his firing, but she did not make any recommendations to Spence, and no evidence indicates that the notes she took played any role in the adverse employment action Plaintiff suffered. The Court will therefore grant the motion with respect to Defendant Seamon. She will be dismissed from the case.

### v.  Gregory Amorosi

Defendants likewise seek to dismiss any claims against Defendant Amorosi. They contend that he was not involved in the decision to terminate Plaintiff and cannot be held liable for that action. Plaintiff contends that Amorosi could be liable under an aiding and abetting theory.

As explained above, the parties disagree about Amorosi's knowledge of Plaintiff's disability. Plaintiff insists, however, that he told Amorosi about his injuries and the limitations and needs they caused. A question of fact therefore exists for a jury to decide on that issue. The parties do not dispute that Amorosi attended the counseling meeting that forms the center of this dispute, or that he met with Kerner, Leo, and Ed Aluck after that meeting to discuss how to respond to Plaintiff's conduct. The parties also do not

40

dispute that Amorosi was not present at the meeting where officials recommended to Spence that Plaintiff be fired.

Given those facts, the Court finds that a reasonable juror could conclude that Amorosi aided and abetted discrimination and retaliation because of Plaintiff's disability. A reasonable juror could infer that the meeting that Kerner, Leo, Amorosi, and Aluck consisted of a decision to recommend that Plaintiff be fired because of his disability. That juror could find that the circumstances indicate that the Defendants agreed to recommend Plaintiff's firing not because of his conduct, but because of his disability and his complaints about discrimination because of that disability. Under those circumstances, a question of fact exists as to whether Amorosi aided and abetted violations of the NYSHRL. The motion will be denied in this respect as well.

### B.    FMLA

Defendants next claim that Plaintiff cannot maintain any interference or retaliation claim under the FMLA because no evidence exists that he ever used FMLA leave. To sustain an interference claim under the FMLA, a plaintiff must show "1) that [he] is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [he] was entitled to take leave under the FMLA; 4) that [he] gave notice to the defendant of [his] intention to take leave; and 5) that [he] was denied benefits to which [he] was entitled under the FMLA." Graziado v. Culinary Inst. of America, 817 F.3d 415, 424 (2d Cir. 2016). To establish an FMLA retaliation claim, Plaintiff must show "'that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.'" Id. at 249 (quoting

<u>Donnelly v. Greenburgh Cent. Sch. Dist. No. 7</u>, 691 F.3d 134, 147 (2d Cir. 2012)).

Plaintiff did not respond to Defendants' motion in this respect. He could not prevail even if he had. Under either an interference or a retaliation theory under the FMLA, a Plaintiff must show at least an attempt to exercise a right available under the FLSA. No evidence here indicates that Plaintiff ever tried to use such leave. He therefore cannot prevail on this claim, and the Court will grant the motion in this respect.

## IV.    CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment, dkt. # 26, is hereby GRANTED in part and DENIED in part. The motion is GRANTED with respect to Plaintiff's claims brought pursuant to the FMLA. The motion is also granted with respect to all claims against Defendants Spence and (Tropiano) Seamon as individuals. The Clerk of Court is directed to TERMINATE those two Defendants from the litigation. The motion is DENIED in all other respects.


**IT IS SO ORDERED**


Dated:September 6, 2019




Thomas J. McAvoy
Senior, U.S. District Judge

42