**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOHN MURPHY,

                                      Plaintiff,            1:17-cv-00628 (BKS/TWD)

v.

NEW YORK STATE PUBLIC EMPLOYEES
FEDERATION, CHRISTOPHER LEO, TODD KERNER,
and GREGORY AMOROSI,

                                      Defendants.

**Appearances:**

*For Plaintiff:*
Ryan M. Finn
Finn Law Offices
P.O. Box 66509
Albany, New York 12206

*For Defendants:*
Louis P. DiLorenzo
Bond, Schoeneck & King, PLLC
600 Third Avenue, 22nd Floor
New York, New York 10016

Adam P. Mastroleo
Hannah K. Redmond
Bond, Schoeneck & King, PLLC
One Lincoln Center
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

      Plaintiff John Murphy brings this employment discrimination and retaliation action under

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq., and the New York

State Human Rights Law ("NYSHRL"), 15 N.Y. Exec. Law § 290 et. seq., against Defendants

New York State Public Employees Federation ("PEF"), Christopher Leo, Todd Kerner, and

Gregory Amorosi. (Dkt. No. 2). Plaintiff asserts that Defendants terminated his employment

because of his disability and in retaliation for complaining of disability discrimination. (Dkt. No.

2). The Court held a three-day bench trial on this matter from July 6–8, 2021, at which nine fact

witnesses and one expert witness testified. The parties submitted post-trial proposed findings of

fact and conclusions of law. (Dkt. Nos. 86, 91). After carefully considering the trial record, the

credibility of the witnesses at trial, and the submissions of the parties, the Court finds Plaintiff

has failed to prove by a preponderance of the evidence that Defendants discriminated or

retaliated against him in violation of the ADA or NYSHRL. The following constitutes the

Court's findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

### A.    New York State Public Employees Federation

PEF is a public-sector union with approximately 50,000 members throughout New York

State. (Tr. 382, 552).[1] It primarily represents professional, scientific, and technical employees,

including attorneys, nurses, and engineers. (Tr. 382). PEF is led by a President, three Vice

Presidents, a Secretary-Treasurer, three trustees, and twelve Regional Coordinators; they are

elected by the PEF membership in triennial elections for three-year terms. (Tr. 311–12, 382–83).

In addition, PEF has an Executive Board comprised of approximately 100 elected members who

serve three-year terms. (Tr. 382–83).

PEF is also a private-sector employer, with approximately 150 employees of its own.

(Tr. 389). Of these employees, twenty or so are "management confidential" employees, meaning

---

[1] The Trial Transcript, (Dkt. Nos. 83–85), is abbreviated as "Tr. ___." Plaintiff and Defendants' exhibits entered into
evidence at trial are abbreviated as "Pl.'s Ex. ___" and "Defs.' Ex. ___," respectively.

they are at-will employees who are not represented by any union.[2] (Tr. 389, 556). The "management confidential" employees include executive, legislative, and education and training director positions, as well as federal and state lobbyist positions. (Tr. 394–95, 397, 542). PEF has two offices in the greater Albany area; the main office is in Latham and it has a "much smaller," legislative office in downtown Albany. (Tr. 396).

Plaintiff John Murphy was employed by PEF as a federal lobbyist, a management confidential position, from 2005 until December 4, 2015, when his employment was terminated. (Tr. 43–44, 97).

**B.      John Murphy**

**1.      Motor Vehicle Accident and Gradual Return to Work**

Sixteen months before his termination, Plaintiff was in a serious motor vehicle accident; on August 2, 2014, an impaired driver hit his vehicle at a high rate of speed. (Tr. 51). Plaintiff testified that he suffered a traumatic brain injury with post-concussive syndrome, for which he received treatment at a rehabilitation center for head injuries. (Tr. 52, 57). In addition, Plaintiff had a "cognitive disorder," and "severe headaches." (Tr. 55). Plaintiff testified that he also has difficulty with his vision—his eyes can no longer "converge or come together," which causes him to have "blurred" and "double vision," and necessitates prism glasses. (Tr. 55). Plaintiff also has "issues with [his] sleep" and "severe pain in [his] hip, ankle, and wrist." (Tr. 55). Plaintiff testified that these injuries have affected his ability to sleep, walk, and work. (Tr. 55). Plaintiff has received occupational, physical, and vision therapy since the accident. (Tr. 54).

Plaintiff was unable to work for the first thirty days after the accident. (Tr. 52). The human resources ("HR") office asked for, and Plaintiff provided, medical notes concerning his

---

[2] The majority of PEF's employees are represented by the United Steel Workers union and not PEF. (Tr. 389, 556).

condition. (Tr. 59; Pl.'s Ex. 1, at 44–46). All three are brief. (Pl.'s Ex. 1, at 44–46). The first is dated August 4, 2014 and states: "Mr. Murphy is suffering from injuries due to a motor vehicle accident and is disabled from work. He will be re-evaluated on 8/11/2014." (Pl.'s Ex. 1, at 46). The second is dated August 11, 2014, and states: "Mr. Murphy was seen today in medical follow-up of injuries sustained in recent accident. He remains disabled from work and will be re-evaluated on September 2nd." (Pl.'s Ex. 1, at 45). The third is dated September 2, 2014 and states: "Mr. Murphy was seen today for medical follow-up. He is cleared to return to work on a limited basis (certainly not able to work either a full 8 hours or everyday yet). He will be reevaluated on 9/22." (Pl.'s Ex. 1, at 44). Plaintiff testified that he discussed "[a]ccommodations" with the PEF human resources office, including his need for "periodic breaks" and kept "the human resource office aware of [his] progression." (Tr. 56).

Jennifer Seamon, a human resources administrator, testified otherwise. Seamon stated that she repeatedly asked Plaintiff to "fill out a disability form for PEF," but that he did not do so, that she asked Plaintiff for a doctor's note, but he "wasn't getting one," and that she "had a difficult time getting medical from Mr. Murphy." (Tr. 275, 277–78, 284). Seamon's testimony, however, was vague and somewhat evasive. Seamon twice claimed not to be "privy" to the process of obtaining Plaintiff's medical paperwork concerning his medical leave and further stated that her contact with Plaintiff was "very limited" and that she was not aware of any request for accommodation as she did not "supervise him," (Tr. 284, 300). The Court therefore does not credit Seamon's testimony regarding Plaintiff's interaction with the human resources office.

Plaintiff had "extensive therapy," and "as therapy progressed," he "became better." (Tr. 59). In September 2014, Plaintiff returned to work one day per week. (Tr. 52). Over the next

seven months, Plaintiff progressed to working two days per week, and eventually, full-time—although, he testified that he still required periodic breaks for his eyes. (Tr. 52, 202). PEF gave Plaintiff a laptop so he "was able to work outside of the regular hours." (Tr. 56).

Despite his progress, Plaintiff testified that he continued to have "issues with concentration," vision, and would "twitch" and "shake." (Tr. 56). He was able to do his job by pacing himself, coming "to work a little earlier," working through his lunch hour, staying late, and making "up any time for doctor's appointments." (Tr. 57). Prior to the accident Plaintiff did not wear glasses. (Tr. 132). Plaintiff testified that after the accident he wore prism glasses "to make his eyes come together" and that he used a cane at work. (Tr. 55, 63, 204). Plaintiff explained that his "eyes are heavily damaged" and they "will not converge or come together" causing "blurred vision, double vision" and "blind spots." (Tr. 55, 132, 202–03, 205). Plaintiff had different prescriptions for prism glasses as he progressed. (Tr. 133). In November and December 2015, Plaintiff's condition "was better than" it was immediately after the accident, but he testified that he still had to wear prism glasses to read and write and needed to take breaks for his eyes. (Tr. 90–91). Plaintiff testified that he "had to have" his prism glasses "[t]o do the legislative work." (Tr. 206). Plaintiff testified that because of the "blind spots" and blurred and double vision, he does not "see well" or "walk well," without the prism glasses (Tr. 203–205). Plaintiff testified that he wears the prism glasses most of the time but on "a good day," he can take the prism glasses "off a little bit." (Tr. 117). Plaintiff also testified that he took periodic breaks to "walk" and "move around because sitting in one place was so painful"—he had pain in his neck, back, hip, and legs. (Tr. 63).

There was conflicting testimony regarding whether Plaintiff wore glasses and used a cane. Co-worker Danielle Little Thomson recalled seeing Plaintiff at a convention sometime

prior to 2015 wearing glasses that he explained were "the special glasses that Hillary Clinton had worn for a while," but she testified that during the relevant time period she never saw Plaintiff wearing glasses or using a cane. (Tr. 520, 526, 545). Plaintiff's supervisor, Amorosi, testified that he did not recall seeing Murphy with glasses or a cane, (Tr. 226–27). Kerner and Leo did not see Plaintiff wearing glasses. (Tr. 417, 466). On the other hand, co-worker Scott Lorey testified that Plaintiff wore glasses, (Tr. 545). The Court credits Plaintiff's testimony that he used prism glasses at times for difficulty that he had with his vision, but given the credible testimony from witnesses who did not see Plaintiff wearing prism glasses the Court does not credit Plaintiff's testimony regarding the extent of his need for prism glasses. The Court does not credit Plaintiff's testimony that he wore prism glasses most of the time or that he needed prism glasses to walk or that his eyesight impaired his ability to walk. Given the credible testimony from, inter alia, Amorosi, who did not see Plaintiff using a cane, the Court does not credit Plaintiff's testimony that he needed a cane during the relevant time.

### 2.  Election of New PEF President and New Administration's Transition Period

In June 2015, Wayne Spence ran against incumbent Susan Kent in a contentious campaign for president of PEF and, in an election on June 20, 2015, won by a margin "so small that a recount" by the American Arbitration Association "was required by [PEF's] constitution." (Tr. 556–57). There was a transition period between Spence's election and his assumption of office on August 1, 2015. (Tr. 437–38). Spence hired Christopher Leo as his chief of staff and to chair the transition. (Tr. 437). Leo was also the acting director of the legislative department in 2015. (Tr. 436). During the transition period, Leo worked in a conference room with a computer and telephone at PEF's Latham headquarters. (Tr. 438). Leo explained that he was in a first-floor conference room, "in the furthest part away from everywhere else and other than having official

conversations" and that he "was not allowed to roam the building." (Tr. 439). Leo was "the only representative of the incoming administration" and "was not a very welcomed person" in the building. (Tr. 439).

Although technically a new hire in June 2015, Leo had worked for PEF previously. From 2011 to 2014, Leo had worked for PEF as a state lobbyist; in that position, Leo and Plaintiff, a federal lobbyist, were "[e]quals" and had worked in offices next to each other. (Tr. 444–45). Leo described his relationship with Murphy during this time as "good, office cordial, professional." (Tr. 447). However, Plaintiff and Leo testified to very different versions of their interactions during the transition period.

Plaintiff testified that on Leo's first day during the transition period (late June 2015 through August 1, 2015), Leo entered Plaintiff's office and said: "hey, I hear you're retarded now because you can't see, and how's that going for you?" (Tr. 62). Plaintiff responded by telling Leo about "the problems that [he] had and told him that [he] didn't like to be spoken to that way or be called retarded because I couldn't see." (Tr. 62). After that, Leo's "behavior became unbearable." (Tr. 62). Over the next few months, Leo would enter Plaintiff's office "numerous times a day, he would make fun of [Murphy's] vision, he would make fun of the way [Murphy] walked, he would make fun that [Murphy] had a cane." (Tr. 63). Plaintiff testified that "one of Chris Leo's favorite tactics was he would come in fast," sit in the chair across from Plaintiff and push it "right up against" Plaintiff's leg, causing pain to "shoot through" and knocking over Plaintiff's coffee. (Tr. 63–64). Leo would also take Plaintiff's glasses, "move them around," and say: "you're retarded, you can't see . . . you're no good to us anymore, you should go back to the legislative office building where the retards work who can't see or talk." (Tr. 64). Plaintiff explained that he would stutter when he got nervous and that Leo would make

fun of his stutter. (Tr. 64). Plaintiff testified that his duties "were completely taken away" after the Spence Administration took over, explaining that Leo prohibited him from talking to members—or to "anybody" who "tried to reach out to [him]—and from interacting with elected officials." (Tr. 66, 70). Leo also threatened that Plaintiff would "be sorry" and would "be in trouble" if he spoke to anyone. (Tr. 66). Plaintiff testified that Leo's abusive behavior continued even after Plaintiff was transferred to PEF's legislative office in downtown Albany, as Leo visited that office a "[c]ouple times a week" and would harass Plaintiff when he did. (Tr. 211, 214).

By contrast, Leo testified that he had no interaction with Plaintiff during the transition period. (Tr. 438). When asked about Plaintiff's testimony that when he first started on the transition team, Leo went to Plaintiff's office and "called him retarded" Leo responded that it did not happen and that he was not "even allowed upstairs" and "was not allowed to roam the building." (Tr. 439). Leo "[h]ad no idea" that Plaintiff had any limitations or physical issues and there was nothing about the way Plaintiff moved or acted that indicated a disability. (Tr. 449). Leo never saw Plaintiff wear glasses. (Tr. 466). Leo also stated that he was not aware at any point before Plaintiff was terminated in December 2015 that he had been involved in a car accident. (Tr. 447). The Court does not credit Leo's testimony that he was not aware at any point before Plaintiff was terminated that he was in a car accident because on October 2, 2015, Leo received an email from Danielle Thomson forwarding two emails she had received from Plaintiff concerning his absence from work to attend "therapy . . . for my car accident." (Pl.'s Ex. 32). The Court does not credit Leo's response when asked whether he had reviewed the email. Leo responded: "I don't know if I've ever received it because . . . I get hundreds of e-mails per day as chief of staff and I'm cc'd on quite a bit and normally if I see a forward, I got to be honest with

you, I don't read them." (Tr. 469). Having observed Leo and Plaintiff's testimony, and considered their testimony in light of the entire record, the Court credits Murphy's testimony that Leo was harassing him about, at the very least, Plaintiff's need for physical therapy.

### 3.   Spence Administration's Takeover

It is largely undisputed that, in general, the atmosphere at PEF is "politically charged." (Tr. 323, 385–87). The atmosphere following Spence's election and continuing after his inauguration and takeover on August 1, 2015 remained "politically charged" and "touchy." (Tr. 386). Spence explained that not only had the election been contentious—there was "bad blood between" Spence and his rival Susan Kent—but he was facing the fallout from "potential[] criminal activity" within PEF, which led to the involvement of PEF's "international" and "parent unions." (Tr. 559). Spence had also learned of a court case that had the potential to reach the United States Supreme Court "where unions could lose the ability to collect dues" and explained there was a "sky has fallen down type of sentiment that unions are going to be in really big trouble if this became the law." [3] (Tr. 560). In addition, Spence was the first African American to be elected president of a union that was 75 percent white and people of color did not support him because they believed Spence to be "a figurehead" and not "a real president." (Tr. 560–61). Finally, of the three vice presidents who were elected, Nikki Brate, Peter Banks, and Adreina Adams, only Adams had not "turned on" Spence upon his election. (Tr. 561–63). Thus, following Spence's takeover as president, several PEF management confidential employees, including Plaintiff's supervisor, were terminated as they were "more loyal to the outgoing administration than the incoming administration." (Tr. 395, 444). As the acting legislative

---

[3] Spence was referring to the Supreme Court's grant of certiorari on June 30, 2015, in *Friedrichs v. Cal. Tchrs. Ass'n*, 576 U.S. 1082 (2015). In 2016, the judgment was "affirmed by an equally divided Court." *Friedrichs v. Cal. Tchrs. Ass'n*, 578 U.S. 1, 3 (2016) (per curiam).

director, Leo became Plaintiff's supervisor. (Tr. 61, 397). In addition to hiring Leo as chief of staff and acting legislative director, and as relevant to this case, Spence hired Todd Kerner as executive director. (Tr. 381).

Prior to being elected PEF president, Spence had been a vice president on the executive board and had become acquainted with Plaintiff in his role as a federal lobbyist. (Tr. 576). Spence testified that after his intent to challenge Susan Kent for the presidency had been made public, Plaintiff began having conversations with Spence "badmouthing Susan and the administration and his boss, the director for the legislative office." (Tr. 577). Spence was aware that Plaintiff had been in a car accident because he had seen Plaintiff at an executive meeting while Spence was a vice president, with "white bandages wrapped around his head and he was walking with a cane" and had told Spence that he was in an accident. (Tr. 590–91). However, Spence knew nothing of a disability, Plaintiff's medical condition, or Plaintiff's physical therapy appointments. (Tr. 593). At trial, Spence recalled seeing Plaintiff two or three times between winning the election and his termination. (Tr. 591).

Spence's executive director, Kerner, interacted with Plaintiff "two or three times," between the Spence Administration's inauguration and Plaintiff's termination. (Tr. 395, 397, 559). Kerner described those interactions as "[s]ort of annoying, because he knew that Chris Leo was his supervisor and he wanted to tell me about federal legislation and everything that's going on and I just said, you know, John, I got enough of my own stuff to do, you're going to have to talk to Chris." (Tr. 397).

### 4.    Office Move, Hiring of New Supervisor, and Change in Duties

In August 2015, finding a shortage of offices in the executive wing of the Latham office upon taking over, Spence and Kerner reassigned offices. (Tr. 399, 592). Spence instructed that Plaintiff be moved to PEF's legislative office in downtown Albany. (Tr. 593). Spence explained

that he moved Plaintiff because a "young lady" had indicated that moving to an office nearer to Plaintiff would make her "uncomfortable," it made sense for Plaintiff, who worked in "legislative" matters, to work in PEF's legislative office, and there were empty offices in the legislative office. (Tr. 593).[4] Plaintiff did not want to move to the Albany legislative offices and, according to Leo, "attempted to go around [Leo] as a direct supervisor" by going to Spence and to Kerner "to discuss not moving his office," and Plaintiff also enlisted Vice President Peter Banks, whom the Spence administration viewed as an "insurgent," to ask Leo to stop the move. (Tr. 448–49). Spence, however, testified that no one came to him to try to convince him that Plaintiff's office should not be moved and that he did not recall Plaintiff trying to meet with him. (Tr. 593, 657).

In September 2015, Greg Amorosi was hired as PEF's legislative director and assigned to PEF's Albany legislative office, where he was responsible for supervising Plaintiff. (Tr. 65–66, 218, 238). Plaintiff testified that prior to Amorosi's arrival, Leo had changed Plaintiff's "duties" and had instructed him not to speak or interact with PEF members or elected officials, and told Plaintiff that if "anybody tried to reach out" to Plaintiff and Plaintiff spoke to them, Plaintiff would "be sorry" and would "be in trouble." (Tr. 66). Leo denied prohibiting Plaintiff from interacting with elected officials and acknowledged that Plaintiff would not have been able to perform his job under such a prohibition. (Tr. 453).

Plaintiff testified that not "too long after" Amorosi was hired, (Tr. 80), he told Amorosi "what was going on, that Chris Leo was harassing [him] because of [his] visual problems and [his] physical disability." (Tr. 66, 146). Plaintiff stated that Amorosi had a "pad of paper with

---

[4] Plaintiff does not claim this was an adverse action or due to his alleged disability.

him" and told Plaintiff: "thank you for telling me." (Tr. 66–67). Plaintiff testified that he never heard back. (Tr. 67).

Amorosi recalled this meeting differently and testified that Plaintiff did not use the word discrimination. (Tr. 221). Amorosi stated that the meeting was in his office "and it was about John's hands being tied in terms of work, the work that he was not allowed do." (Tr. 221). Plaintiff explained that he was not able to do the work that he previously had done. (Tr. 221–22). Amorosi stated that when he took "out a notepad" to "write down the conversation with the aim to go talk to [Leo] to try to figure it out," Plaintiff said that "he would prefer that I not [take notes] and that it stay between he and I." (Tr. 222). Amorosi "respected his wishes" and did not do anything about Plaintiff's concerns. (Tr. 222). Amorosi was aware that Plaintiff had been in a car accident, and that he was attending physical therapy, but was not aware of any injuries. (Tr. 226, 246). Amorosi's account of this conversation is consistent with the version of events he provided in a memo to Leo shortly before the December 3 counseling session. (Defs.' Ex. 25, at 1). Having observed and considered the testimony of both witnesses, the Court credits Amorosi's version of what happened and concludes that Plaintiff did not complain of disability discrimination to Amorosi in this conversation.

According to Plaintiff, after he complained to Amorosi, Leo became angrier at and more "hostile" and "nasty" toward Plaintiff, swore more at Plaintiff, and pushed into and bumped Plaintiff. (Tr. 150). Plaintiff testified that Leo continued to harass him on a daily basis even after he moved to the Albany office. (Tr. 147). However, Plaintiff's coworkers in the Albany office, Lorey and Little Thomson, testified that from September to December 2015, Leo only visited the legislative office three to five times and that his visits lasted ten to fifteen minutes. (Tr. 523, 547). Lorey testified that he never observed Leo making fun of Plaintiff. (Tr. 547). Plaintiff

stated that Leo also removed more duties, instructing Plaintiff that "if someone e-mailed" him, Plaintiff "couldn't even e-mail back." (Tr. 149). Plaintiff testified that "people came forward because they said that they were used to having me be visual and be around in meetings and do things and people would come and ask me" and Plaintiff "would say, you need to go through Greg Amorosi or Chris Leo." (Tr. 149–50).

In a letter dated November 9, 2015, Plaintiff was invited by the Statewide President of PEF Retirees, to speak "about the latest Federal Legislative issues" at the PEF Retirees 2016 Biennial Leadership Conference. (Pl.'s Ex. 3). The letter was copied to Amorosi. (Pl.'s Ex. 3). Plaintiff had previously spoken at the PEF Retirees conference on an annual basis. (Tr. 69). Plaintiff stated that during previous administrations, he spoke at "numerous events monthly." (Tr. 70). These duties "were completely taken away" when the Spence Administration took over. (Tr. 70).

In a letter to Amorosi dated November 20, 2014, Nora Higgins, PEF Region 12 Coordinator[5] wrote to request that Plaintiff speak "at the next Region 12 PAC meeting in Hauppauge," New York on December 14, 2014, and that he be available "to visit with the engineers in the Region regarding the Transportation Legislation" on December 15, 2015.[6] (Pl,'s Ex. 4). Amorosi showed the letter to Plaintiff and said that he did not understand why Leo was not "allowing" Plaintiff "to do this." (Tr. 72). Plaintiff had been "very actively working on" the transportation legislation "for a while." (Tr. 72). New York was "going to get . . . $8 billion for a certain project that would have funded" PEF's "people, and roads." (Tr. 74). Leo told Plaintiff that he "had to say no" and that "if anybody called" or asked Plaintiff to speak, he "had

---

[5] Murphy explained that a Regional Coordinator was "the head of an area for PEF." (Tr. 72).

[6] Plaintiff explained that there was "a federal transportation package that was going through Washington" that "affected our engineers," who "were funded out of that bill." (Tr. 72).

to say no." (Tr. 76). Plaintiff continued to monitor legislation but was no longer allowed "to interact with PEF members or elected officials." (Tr. 77). Amorosi testified that he was aware that as a federal issues lobbyist, Plaintiff "used to go to Washington, D.C. from time to time" but that he was "no longer allowed to do that," per Leo. (Tr. 222–23).

When Peter Banks approached Plaintiff about "a particular issue," Plaintiff responded that Banks had "to go through Chris Leo." (Tr. 77). Banks responded that he did not understand why he could not go directly to Plaintiff, as he had in the past, and asked Plaintiff if he "felt threatened by Chris Leo" or if Plaintiff "was scared." (Tr. 77). Plaintiff testified that he told Brate and Banks "what was happening"—that he "was being harassed for [his] vision" and because of his "handicap," and that he "was scared." (Tr. 80).

### 5.      Concerns About Plaintiff's Attendance, Work, and Conduct

#### a.      Attendance

Leo testified that while Plaintiff was still in the Latham office, Leo "did not see [Plaintiff] often in the office." (Tr. 450). Leo explained that during the transition period, PEF did not have a contract, Susan Kent was challenging the election internally, they were planning for a convention and executive board meeting, and "in the middle of all this, and when we needed answers for certain things and we looked for certain individuals," Leo noticed that "it was very difficult to find . . . or get ahold of" Plaintiff. (Tr. 450). When Leo spoke to Plaintiff and "asked him where he was," Plaintiff responded that he "must have been in somebody else's office." (Tr. 450).

After Plaintiff moved to the Albany office, Leo received reports from Amorosi that Plaintiff was "very difficult to find and that he was not in the office for any large amount of time." (Tr. 451). During the fall of 2015, Kerner also heard from Amorosi that Plaintiff "wasn't around much." (Tr. 400). Amorosi testified that he told Leo he was concerned about Plaintiff's time sheets and reluctant to sign them because while they reflected that Plaintiff worked daily

14

from ten to six, Plaintiff was not there every day from ten to six—"what I saw in the time sheet wasn't matching up with what I saw" in the office. (Tr. 223–25). Amorosi "came to understand" that if an employee worked from home or in the office, so long as the employee worked, it was appropriate to "put down P for present." (T. 225). Amorosi never raised his time sheet concerns with Plaintiff or any concerns about medical appointments. (Tr. 225–26).

### b.     Work Performance

In the fall of 2015, Leo met with the staff of United States Senator Charles Schumer's office. (Tr. 451). Leo testified that Senator Schumer's chief of staff "really had no idea" who Plaintiff was. (Tr. 451). When Leo explained Plaintiff's responsibilities, the chief of staff was able to recall Plaintiff and said: "oh, that's the guy, he always sends us e-mails about things that don't make any sense or to the wrong departments" and asked Leo if he could ask Plaintiff "to stop doing that." (Tr. 452). This was "very" concerning to Leo. (Tr. 452).

Kerner attended a conference in November 2015, where he met with United States Senator Kirsten Gillibrand's policy director, who said that "they hadn't had much interaction with PEF." (Tr. 401). Kerner responded that they "must have" because PEF had "a federal person that says he comes down here and talks to you all" and that his name was John Murphy. (Tr. 401). Kerner also met with an individual, who was Senator Gillibrand's labor liaison, who said "he didn't know John Murphy either." (Tr. 401).

Amorosi testified that he generally had no problems with Plaintiff's work product and never raised any concerns about it with Plaintiff. (Tr. 220).

### c.     Conduct

In September 2015, Spence received a call from Dee Dodson, who "had friends on the executive board," and who told Spence that "people" were telling her that Plaintiff was "talking about" Spence and saying that Plaintiff thought Spence was "going after him." (Tr. 582). At

some point after the September 2015 executive board meeting, "several people who were Susan[ Kent's] supporters" warned Spence to "be careful of Murphy, because he's speaking bad about you." (Tr. 578). After receiving this information, Spence concluded, that it was Plaintiff's "modus operandi," to, no "matter who's in power," "say shit about them," and instructed "Leo to direct Mr. Murphy not to be at any more executive meetings." (Tr. 577, 579; *see also* Tr. 582 (Spence testifying that it was "a month in, and [Plaintiff is] now telling people that as the new president, that the union is shit, and basically I'm hearing" that Plaintiff was saying "the same thing he would say about Susan [Kent]" but "about me")). Leo and "[o]ther folks" had also "pointed out" to Spence that Plaintiff had been "seen with Nikki [Brate] and Peter [Banks]," who were "known" to have issues with Spence. (Tr. 583). The Court credits this testimony from Spence.

Plaintiff's coworkers at the Albany office, Scott Lorey and Danielle Little Thomson testified that in the fall of 2015, Plaintiff made numerous comments about PEF being "fucked up." (Tr. 520–21, 545–46). Lorey recalled hearing Plaintiff comment, fifteen to twenty times, that "these people could fuck up a free lunch, and that this place is so fucked up." (Tr. 545–46). Lorey could not recall the discussion "exactly," but between September and December 2015, Plaintiff also told Lorey that he did not "like what [Leo] was doing, his job performance." (Tr. 548). Little Thomson stated that "50 to 60 times" that fall, Plaintiff said that he "felt that PEF was all F'd up . . . the union was going to hell in a handbasket, and nobody knew what they were doing, no idea, they were clueless." (Tr. 520–21). Little Thomson reported Plaintiff's statements to Amorosi, her direct supervisor. (Tr. 522). She never heard Plaintiff talking about Leo. (Tr. 522). Amorosi testified that he heard Plaintiff say that PEF "was going to hell in a handbasket" "on a couple of different occasions," when "someone would leave the union."

(Tr. 231). Amorosi did not think Plaintiff's expression of "his opinion about what he thought was going on in the union was insubordination." (Tr. 232). Amorosi stated that on these occasions, Plaintiff would "say that things were fucked up." (Tr. 247–48). Amorosi stated that Little Thompson reported that Plaintiff was "overheard" saying that Amorosi was "clueless about federal issues" and that he "didn't care for [Leo] or President Spence." (Tr. 249). The Court credits Amorosi's testimony.

Leo and Kerner also received reports that Plaintiff was speaking poorly about the Spence administration. Leo testified that Dee Dodson, Jim Kemenash, and Randi Diantonio, an executive board member, all reported that Plaintiff was saying that Leo, Kerner, and Spence "didn't know what [they] were doing, [and] that [they] were ruining the union, that people were leaving because of [them]." (Tr. 453). Leo felt that Plaintiff, by disparaging the Spence administration, was "add[ing] to that political charge," explaining that the Spence administration was still "trying to get [its] footing" and the election was still "being challenged, and the last thing [they] need is a staff member, especially a [management confidential] staff member, running around undermining or badmouthing the administration." (Tr. 453–54). Kerner testified that Executive Board members Randi Diantonio and John Prince told Kerner that Plaintiff had been telling them that his "hands are tied," that he was not being allowed to "do anything," including his job, and that he did not "know what's going on." (Tr. 402).

### 6.    December 2015 Executive Board Meeting

As relevant here, there were executive board meetings in September and December 2015, and Leo, Kerner, and Spence had agreed that they "didn't want a lot of staff at these executive board meetings," and planned to "decide which staff attends." (Tr. 454). Leo testified that he directed Plaintiff not to attend the September 2015 executive board meeting, but that Plaintiff had nonetheless attended the meeting. (Tr. 454–55). Plaintiff testified that he attended the

September 2015 executive board meeting and that Leo had asked him to go because "they were going to discuss federal legislation." (Tr. 180–81). Plaintiff acknowledged that between September and December, he was told not to go to any additional executive board meetings. (Tr. 181).

Plaintiff testified that he did not attend the December executive board meeting, which was held on December 1 and 2, 2015 at the Hilton Albany. (Tr. 181, 607–08). Spence and Leo testified to the contrary. Leo stated that he saw Plaintiff enter the meeting via a side door and make "a beeline right to Vice President Peter Banks," making it clear to Leo that Plaintiff had "aligned himself with . . . the insurgents." (Tr. 455). Spence stated that while on the dais chairing the meeting, he saw Plaintiff in "the back of the room." (Tr. 580). Spence "was pissed" and spoke with Leo at a break in the meeting. (Tr. 581). Leo told Spence he did not know why Plaintiff was there and Spence instructed him to "find out." (Tr. 581).

### 7.      December 3, 2015 Counseling Meeting and Termination

The morning of December 3, 2015, Spence initiated a phone conference with Leo and Kerner regarding Plaintiff's presence at the executive board meeting. (Tr. 584). Spence recounted his mental process leading to the phone call: "I'm just going through my head, I'm just really getting annoyed. I got all these things on my plate and freaking John Murphy's name keeps coming up." (Tr. 583). Spence testified that during the phone conference, he learned Leo had told Plaintiff not to attend the executive board meeting. (Tr. 584, 456–57). Spence testified that upon learning that "there was no reason for [Plaintiff] to have been there," he told Leo and Kerner that he wanted Plaintiff fired: "[t]hat simple." (Tr. 584, 456–57, 403–04). Kerner recalled Spence telling them that he wanted Plaintiff fired because he had "had enough of this . . . crap, he can't do what he's doing, he's not listening to direction, he's speaking bad about this, there's

enough going on with Nikki [Brate][7] and Peter [Banks] and everybody else, I don't need this aggravation." (Tr. 403–04). According to Spence, Leo and Kerner responded that they did not believe Plaintiff's conduct would "merit termination," but that they would "look into it" and that they would "counsel him because they think its fixable, they can fix it." (Tr. 585; *see also* Tr. 457 (Leo testifying that when Spence "said just get rid of" Plaintiff, he and Kerner "said, look, let us talk to him . . . let's just have a meeting and see if we can get through"), Tr. 404 (Kerner testifying that in response to Spence's directive to fire Plaintiff, he asked: "well, can we talk to him" and "see if we can get him to understand he can't be like that")). Kerner was also concerned how such a termination would reflect on Spence. (Tr. 404). Kerner and Leo "pointed out that" Spence had enough "on [his] plate," that Plaintiff was "liked by the . . . some of the members on the executive board," and that "to terminate him now would not be a good thing, the optics of it would not look good." (Tr. 586). Kerner and Leo said Plaintiff's "biggest issue was his insubordination," which "was fixable," and that they would "counsel him" and that he would not "be going back to the executive board." (Tr. 586). Spence disagreed but told them he "would go along." (Tr. 586).

Kerner arranged for Amorisi to set up a meeting with Plaintiff later that afternoon. (Tr. 404). Kerner asked Leo, Amorosi, and Ed Aluck, PEF's deputy counsel for personnel matters to attend the meeting. (Tr. 405). Kerner also asked Jennifer Seamon, a member of HR, to attend the meeting in order to take notes. (Tr. 405). Prior to the meeting, Leo asked Amorosi to prepare a memorandum outlining "the different things that he had mentioned . . . over . . . the last few weeks." (Tr. 458).

---

[7] Spence explained that Vice President Brate had "put out an e-mail to the executive board . . . saying that [Spence] verbally assaulted her." (Tr. 584).

Approximately fifteen minutes before the December 3, 2015 meeting, Leo received a memo from Amorosi outlining Amorosi's "thoughts, observations and facts relative" to Plaintiff. (Defs.' Ex. 25). In the memo, Amorosi stated that Plaintiff had "made it clear" from the outset that he had a "problem with" Leo, that Leo had "changed the parameters under which he used to operated," that his "hands were tied and that he was not allowed to work how he used to," and that "he worked for [Amorosi] and not [Leo]." (Defs.' Ex. 25). Amorosi stated that when he asked Plaintiff how to "solve this," Plaintiff "became defensive" and asked Amorosi to keep things "between you and me" and said he did not "want to get in trouble." (Defs.' Ex. 25). Amorosi also noted the following:

- Amorosi asked Plaintiff for briefing "on the federal issues" prior to a convention, but came away from the briefing "feeling like [he] had learned nothing" and Plaintiff failed to follow up on at least one assignment.

- Plaintiff was "seldom" in the office, and when he was, "it was not clear what he was doing" and he "spent a lot of time in his office with the door closed talking on his cell phone" and took three-hour lunches if Amorosi was not in the office.

- Although Plaintiff had told Amorosi that "he was in a bad car accident and had regular physical therapy," Plaintiff's time sheets indicated that Plaintiff "was present each day" and that he "seemed to have a ton of accumulated sick time," which Amorosi found "odd given the fact that he seemed to be constantly out at physical therapy."

- There were five dates in October and November 2015, when Plaintiff reported to work at or after 3:00 p.m.

- Plaintiff "would often say that he worked late because 'that's when things get done in Washington," but that "[o]n more than one occasion, his late nights ended around 6:30 p.m."

- Twenty hours was a "generous" estimate of the number of hours Plaintiff worked each week.

- Plaintiff complained several times in Amorosi's office that "people had a problem" with Leo, and that at least two employees left PEF because of Leo and had also complained to Amorosi about not being invited to a convention and blaming Leo.

- Amorosi received a text in November 2015 that Plaintiff "had spent 30 minutes complaining about [Leo] and that PEF was 'going to hell in a handbasket.'"

- Amorosi had learned that Plaintiff was "telling people" that Amorosi did not like, and was having problems with, Leo, that Plaintiff had been criticizing Amorosi and Leo as "clueless" and being critical of PEF and its leadership, and that he had been "ranting" about Leo and Spence.

- Plaintiff was telling political action committee chairs that Leo had "negatively impacted his ability to work."

(Defs.' Ex. 25).

Plaintiff arrived at the Latham office for the meeting in the afternoon of December 3, 2015. (Tr. 81, 404). Plaintiff testified that as he entered the room, Leo told him "to shut the fuck up and sit down." (Tr. 82). Leo denies saying this. The parties agree that in addition to Plaintiff and Leo, Kerner, Amorosi, Aluck, and Seamon were in the conference room. (Tr. 82). Defendants maintain that the notes Seamon prepared outlining what was said at the meeting, which are contained in Defendants' Exhibit 20, are correct; Plaintiff maintains they are incomplete because they do not contain the formal complaint of disability harassment he made "towards the end of the meeting." (Tr. 84–85). Excerpts of the meeting notes are included below, with any disputes as to correctness noted. (Tr. 85).

At the beginning of the meeting, Plaintiff asked: "What is this about?" "What is going on?" (Defs.' Ex. 20, at 1). According to the meeting notes, Leo responded that there were "a few things" and that Plaintiff had been "speaking out in ways you should not be" about why two PEF employees left. (*Id.*). Plaintiff denies this was said, but offered no alternative. (Tr. 85). The meeting notes continue as follows:

| Murphy: | "You have attacked me since you have come on staff this is all out there." |
|---|---|
| Leo: | How about you talking to Dee Dodson at a PAC meeting? Jim Kemmenash?? Telling people that he is not too happy here??? That |

Wayne and myself are not too happy with him?? And, of course, something else now: where are you and what are you doing most of the day? Doing physical therapy?

(Defs.' Ex. 20, at 1; Tr. 85).

Murphy:     "This is bullying [and harassment] and you've treated me like this from the day you started."

(Tr. 85).

Aluck:      John, when you take time off for physical therapy/medical appointments, we have the right to know, - and to have you complete an FMLA form as well as complete the necessary paperwork. That is something [Seamon] can provide for you.

Murphy:     I have a Dr. note in my file!! Carte Blanche . . . FMLA? Really?

Kerner:     What is wrong here? I mean we hear that you are saying we have it out for you?

Murphy:     He [nodding to Leo] he has had it out for me from the beginning. I have phone calls from him during the day . . . he leaves no messages.

Kerner:     Truthfully, we have an insubordination issue here. Reports of you making despairing comments about the administration, to E-Board members. Reports of you talking ill about the President and Chris Leo.

Murphy:     Not correct. Look, everything I do, - I "cc" my boss on . . . everything is approved. . . . And look, people are talking among themselves.

Kerner:     And how about your claims involving problems with Chris? Claims that your hands are tied? You can't do anything?

Murphy:     Oh, its obvious . . . everyone sees that . . . ask anybody here . . . .

Leo:        . . . Okay, describe your duties here to me . . . other than physical therapy? I am saying this because nobody has had the guts to confront you prior . . . you can't take direction.

Murphy:     Federal issues? Amendment of the house bill and we received national recognition on this. . . . Greg and I did a conference call together . . . spoke to Senator Schumer. Members were on the

conference call, they know what I did . . . . Hey, you{implies Leo} said no meeting with elected officials, no talking with them.

Leo:  Why would I say that? That's your job . . . and by the way, if I "said that," then you violated "speaking with them"? Come on, John.

Murphy:  You're mad because of people. I can't help when "anybody" says stuff.

Leo:  If you were gone as of today, what would we miss?

Murphy:  You would have lost the amendment! We had calls from all over the country . . . people are well aware of this.

Leo:  Yea, you get on that phone, and we are all out to get you!

Kerner:  I have had reports from three different E-Board members, that claim you stated that Chris is out to get you . . . that your hands are tied . . . . Also what about the . . . trip to DC . . . I have heard from staff members that you were asking, "who was going?" and that you mentioned of course, that YOU couldn't go.

Leo:  Let me just tell you, that if you talk negatively, then that is insubordination . . . insubordination is talking down to anyone higher or above you.

Murphy:  I have been removed by PEF, by you . . . from E-Board, Retirees, people, members. What are you getting at? Our relationship with Greg is good.

Leo:  . . . Greg?

Amorosi:  Reports on federal issues that are "going on" [and] he comes to me on what's "going on" [and] he is on the phone.

Amorosi:  No, but in his defense, I have not asked him.

Leo:  Well, we could pull a phone log.

Murphy:  Members are mad!

Kerner:  What you just said! How would you know? . . . .

Leo:  . . . from now on, I want to know and document your work, every minute of his day, including physical therapy.

| | |
|---|---|
| Murphy: | Unbelievable. |
| Kerner: | John, you could be removed today, you are "at will" . . . seriously? I am shocked at this! I could get permission to fire you. |
| Leo: | And we are all well aware of this . . . this talk of your has been going on for a while. |
| Murphy: | What do you mean? No way. People talk. I can't help that. |
| . . . | |
| Leo: | This involves how you act as an employee, how you speak with subordinates . . . bosses. |
| Murphy: | Hey – you are the one who said that Brian had no presence in Albany . . . remember he told us that {leans to Amorosi} Brian Curran was respected. |
| Aluck: | John, again, insubordination, we have no rights to our employment, everything we do, what we say, we are all "at will" employees. |
| Leo: | No termination today, we are going to re-evaluate you in 30 days, your work ethics, your time and attendance, and in that period if I hear one, just one staff member, E-board member, regional coordinator, CSEA . . .[8] |

(Defs.' Ex. 20, at 1–4).

At that point in the meeting, Banks walked by the conference room, which had glass walls. (Tr. 94). Banks "tried to come in" and looked at Plaintiff in a manner that suggested—or Banks said—"what's the matter" and Plaintiff shrugged, putting his palms up. (Tr. 95). The parties disagree about what happened next. Plaintiff testified that he then "made a formal complaint that Chris Leo was harassing me about my disability . . . and making fun of my eyes and my vision"—and that he specifically used the term "formal complaint." (Tr. 96). Kerner,

---

[8] Plaintiff testified that he did not recall Leo saying "No termination today, we are going to reevaluate you in 30 days." (Tr. 94).

Leo, Amorosi, and Seamon testified that after Plaintiff shrugged, Kerner ended the meeting. (Tr. 412–13 (Kerner testifying that "the whole purpose of this [meeting] was to get [Plaintiff] to see he had to change his ways," and that when Plaintiff gestured to Banks in a manner that suggested he did not know why he was there, he concluded that Plaintiff "didn't get it" and stopped the meeting), 461 (Leo testifying that "Mr. Banks came to the door . . . and John just shrugged his shoulders" and that Kerner then "stopped the meeting"), 256–57 (Amorosi testifying that Kerner "stood up and said, we're done."), 303–04 (Seamon testifying that Plaintiff looked at Banks through the glass "and shrugged" and that Kerner ended the meeting)). Kerner, Leo, Amorosi, and Seamon further testified that Plaintiff never complained about or mentioned disability discrimination during the meeting. (Tr. 417 (Kerner testifying that Murphy never mentioned a disability to him during that meeting or otherwise, and nothing about the way that Plaintiff acted indicated that he had a disability—he never observed Plaintiff with a cane or walker, or wearing glasses), 460–61 (Leo testifying that Plaintiff did not claim to have a disability or that he was being discriminated against during the meeting), 256 (Amorosi testifying that Plaintiff did not claim to have a disability, discuss his physical condition, or claim he was being discriminated against), 303 (Seamon testifying that if Plaintiff had made a claim of disability discrimination, Seamon would have included the claim in her notes)).

After Kerner stopped the meeting, he and Leo went to Kerner's office, where they spoke with Spence. (Tr. 462). Kerner was "shocked at how" Plaintiff was "so negative and was so repudiating and demeaning of the people and disrespectful and insubordinate of the people there." (Tr. 413). When Spence asked for his thoughts, Kerner said: "I think John needs to be terminated . . . the first opportunity." (Tr. 414). Kerner explained that they "couldn't have . . . no-show employees and people that were not doing their job, that were badmouthing the

administration." (Tr. 414). Leo, however, told Spence that he thought if Plaintiff were given "a second chance," he might "change his ways." (Tr. 414–15). Leo raised the possibility of a "30-day thing" in lieu of termination because he was "worried about the political fallout" and that Plaintiff's termination could be used against the Spence administration, (Tr. 463); *see also* (Tr. 589 (Kerner testifying that Leo still felt "he could get through" to Plaintiff)). Spence responded that "we should have just fired him earlier when I told you," (Tr. 463), and told Kerner and Leo "to fire" Plaintiff. (Tr. 590; *see also* Tr. 415 (Kerner testifying that Spence instructed Kerner and Leo "to get rid of" Plaintiff and that he did not "need any of this, just do it.")). Spence explained that Plaintiff had been "disloyal," "talked bad about the union," and had "no loyalty to the organization that paid his salary, so I made th[e] decision" to fire him. (Tr. 600). The Court credits that testimony. It is undisputed that while human resources, Kerner, or Todd may recommend an employee be terminated, the "ultimate decision" rests solely with Spence. (Tr. 592).

Because PEF had "a process" for the termination of employees, Kerner and Leo advised Spence that Plaintiff would be placed on administrative leave as of that evening. (Tr. 590). Kerner returned to the conference room and told Plaintiff that he "was on administrative leave and to report back tomorrow." (Tr. 97). When Plaintiff returned to PEF the next day, December 4, 2015, he was told that he had "been terminated." (Tr. 97).

### 8.   Post-Termination Memo

On December 5, 2015, Leo drafted a memo to Spence regarding Plaintiff's termination because there "was already misinformation being bantered about by both Nikki Brate and Peter Banks," who were trying to use Plaintiff's termination to "their political advantage." (Defs.' Ex. 24). The memo provides "a brief historical overview . . . as to what led up to the termination of John Murphy." (Defs.' Ex. 24, at 1). In the memo, Leo referenced:

26

- The August 2015 decision to move Plaintiff's office from Latham to Albany, in order to separate Plaintiff from a PEF employee who had claimed he harassed her, to prevent further harassment, and "to avoid retaliation," and explained that it was a "simple move because Mr. Murphy was part of the legislative office to begin with."

- Plaintiff's efforts to "reverse" the decision to move his office to Albany, "including an attempt to meet with President Spence under the subterfuge of federal legislation."

- Leo twice observed Plaintiff "walking the hallways of the PEF main office" following the move, despite Leo's instruction "that any time [Plaintiff] was at the main PEF office (meetings, trainings, etc.,) he was to report directly to the scheduled meeting and then return to the PEF legislative office."

- Plaintiff's attempts "to arrange non-essential in person meetings at PEF as a pretense to be at the [Latham] office."

- Leo's conversation with Senator Schumer's staff, where Plaintiff's name "surfaced as a negative," and he was told that Plaintiff "communicated via email and would continually request the wrong information from the wrong staff."

- An October 2015 email from a legislative employee who indicated that Plaintiff had placed the blame on Leo for an improper counseling memo and that Plaintiff had made "disparaging remarks."

- The reports Leo received that Plaintiff was stating to "other staff" that Leo was "[o]ut to get him."

- Plaintiff's statements to executive board members that Leo "will no longer let him do his job," "even though the last time [Leo] even spoke to John Murphy was in September 2015." Plaintiff's repeating of "delusional thoughts" to PEF staff "that at Sue Mitnick and Elizabeth Hough left PEF because of Leo."

- Amorosi's concern "with Murphy's behavior and lack of work production, combined with missing from the office for massive amounts of time."

- Plaintiff's statement to Dee Dodson that Spence "[w]as out to get him."

- The "repeated comments from Eboard members" at the December 2015 executive board meeting that "Murphy was being '[h]eld back' by [Leo] and again that [Leo] '[w]as out to get him.'"

- Plaintiff's "paranoia" "in conjunction with his frequent disappearing from the PEF legislative office and poor work performance" as "prompt[ing] the December counseling session."

- Plaintiff's "uncooperative and insubordinate" behavior "throughout" the counseling meeting and Plaintiff's "continued unprofessional behavior" causing the "transition [of] the counseling towards a termination."

(Defs.' Ex. 24).

## III.   CONCLUSIONS OF LAW

### A.   Legal Standard

"The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996); *see Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 731 (2d Cir. 2001) ("[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced.").

### B.   Verified Bill of Particulars

Plaintiff principally relies on a verified bill of particulars, dated July 19, 2016, to establish the extent of the injuries he suffered in the motor vehicle accident as well as to establish that he is disabled under the ADA and NYSHRL. (Defs.' Ex. 3; Dkt. No. 91, at 5). The parties stipulated to the admission of the verified bill of particulars in the Joint Pretrial Stipulation, (Defs.' Ex. 3; Dkt. No. 74, ¶ 2), and the Court received the exhibit into evidence on the first day of trial. (Tr. 12). Defendants argue that because a verified bill of particulars it is not medical evidence or documentation Plaintiff has failed, as a matter of law, to establish disability. (Dkt. No. 86, at 48). Plaintiff responds that "defense counsel . . . should have objected to the bill of particulars being stipulated into evidence" and that the stipulation to the admission of this exhibit, "obviate[ed] the need for plaintiff to incur the cost of bringing in his doctors to testify to his medical condition, which defendants never attempted to dispute." (Dkt. No. 91, at 5). Neither party is entirely correct.

In this case, the stipulation to the admission of the verified bill of particulars is not a stipulation to the truth of the medical summaries it contains—the parties expressly designated Plaintiff's medical condition as disputed. (*See* Dkt. No. 74, ¶ 5.7. (identifying, in the Joint Pretrial Stipulation, the nature and extent of Plaintiff's physical disabilities and health problems as "Facts in Dispute")). Further, Defendants adduced evidence challenging the extent of Plaintiff's disabilities at trial. For example, Kerner testified that he never observed Plaintiff with a cane, walker, or glasses, or acting in a manner that indicated he had a disability, (Tr. 417), Leo testified that he did not observe anything in the way Plaintiff moved or acted that indicated a disability and never saw him wearing glasses, (Tr. 449, 466), and Danielle Little Thomson, who worked with Plaintiff in the downtown Albany office, stated she never saw Plaintiff wearing glasses and that there was nothing about Plaintiff's appearance that indicated he was disabled. (Tr. 520). Thus, the nature and extent of Plaintiff's medical condition following the accident was very much in dispute at trial.

Moreover, the Court's receipt of the verified bill of particulars into evidence is only the first step; the Court must still consider the weight to which the exhibit, and all the evidence regarding Plaintiff's medical condition, is entitled. *See Bahrami v. Ketabchi*, No. 05-cv-3829, 2009 WL 513790, at *9, 2009 U.S. Dist. LEXIS 15545, at *25 (S.D.N.Y. Feb. 27, 2009) ("[I]n a bench trial such as this, [] it is [the Court's] job to weigh the evidence[,] assess credibility, [and] rule on the facts as they are presented." (quoting *Johnson–McClean Techs. v. Millennium Info. Tech. Grp.*, No. 02-cv-244, 2003 WL 192175, at *8, 2003 U.S. Dist. LEXIS 1092, at *24 (S.D.N.Y. Jan. 27, 2003))); *Wechsler v. Hunt Health Sys., Ltd.*, No. 94-cv-8294, 2003 WL 22764545, at *3, 2003 U.S. Dist. LEXIS 21031, at *9 (S.D.N.Y. Nov. 21, 2003) (explaining that "the 'more prudent course in a bench trial [is] to admit into evidence doubtfully admissible

records,' and to permit the parties to aim their arguments at the weight of the evidence." (quoting

*Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977)). Accordingly, the

Court turns to the verified bill of particulars itself.

The verified bill of particulars is dated July 19, 2016, and appears to have been prepared

by Meghan Rielly Keenholts, the attorney who represented Plaintiff in a state personal injury

action concerning the motor vehicle accident. (Defs.' Ex. 3). The document summarizes the

injuries Plaintiff allegedly suffered in the motor vehicle accident, the impact of the injuries on

Plaintiff's life, including his ability to read and write, his cognitive abilities, and his physical

abilities and mobility, as well as his "customary daily activities." (Defs.' Ex. 3). It also lists the

dates Plaintiff received medical treatment, attended physical therapy, and received chiropractic

care and the medications prescribed. (Defs.' Ex. 3). However, it is not verified by Plaintiff—it is

verified by his attorney, Meghan Keenholts, who did not claim to have personal knowledge, but

stated that the "grounds of deponent's belief as to all matters therein stated on information and

belief is derived from statements made by the Plaintiff to deponent and from an investigation

conducted into said matters." (Defs.' Ex. 3). Thus, the document reflects Plaintiff's *counsel's*

understanding and summarization of his injuries and their impact on Plaintiff. (Defs.' Ex. 3).

While Plaintiff affirmed at trial that he reviewed "this document" and that it was accurate at the

time, his affirmance was a cursory response to his attorney's question and he provided no

explanation or elaboration. (Tr. 51). And the document contains information that was never

presented or asserted at trial. (*See* Defs.' Ex. 3, ¶ 13c-f (stating that when Plaintiff returned to

work full-time on March 1, 2015, "his physician limited his work hours to a maximum of 4 hours

per day due to his eye injuries and traumatic brain injury")). The document does not account for

the trial evidence that Plaintiff was working part-time as a toll collector in addition to his work at

PEF. Thus, in light of all of the evidence, and given that the verified bill of particulars was prepared and signed by Plaintiff's attorney, who lacked personal knowledge and did not specifically identify the documents on which it was based, the Court concludes it is entitled to little weight. Accordingly, the Court considers it to the extent it corresponds with Plaintiff's testimony at trial, but no further.

### C.    Disability Discrimination

#### 1.    ADA Discrimination Claim

Plaintiff contends that Defendants terminated his employment because of his disability, in violation of the ADA. (Dkt. No. 2). ADA discrimination claims are governed by the same *McDonnell Douglas* burden shifting framework as Title VII claims.[9] *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (summary order). In order to establish a prima facie case for discrimination under the ADA, a plaintiff must establish: (1) that the defendant is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008); *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004). If an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC*

---

[9] "[A]lthough courts avoid incorporating the *McDonnell Douglas* framework in jury charges, *see Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 154 (2d Cir. 2010) (collecting cases), the 'framework fits comfortably in a bench trial setting.'" *Joffe v. King & Spalding LLP*, No. 17-cv-3392, 2022 WL 1689658, at *3 n.3, 2022 U.S. Dist. LEXIS 94834, at *7 n.3 (S.D.N.Y. May 26, 2022) (quoting *Bucalo v. Shelter Island Union Free Sch. Dist.*, 778 F. Supp. 2d 271, 277 (E.D.N.Y. 2011)).

*Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Under the ADA, "a plaintiff alleging a claim of employment discrimination [must] prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).

In determining whether Plaintiff has established a prima facie case of discrimination under the ADA, the Court's first task is to determine whether Plaintiff is "disabled" within the meaning of the ADA. The ADA defines a "disability" as: (A) "a physical or mental impairment that substantially limits one or more major life activities of [an] individual" (the "actual disability" prong); (B) "a record of such an impairment" (the "record of" prong); or (C) "being regarded as having such an impairment" (the "regarded as" prong). 42 U.S.C. § 12102(1). "Major life activities" include "eating, sleeping, walking, standing, lifting, . . . and working," among other activities. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i). However, "the substantial-limitation requirement in the definition of 'disability' is not an exacting one," *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021) (quoting *Woolf v Strada*, 949 F.3d 89, 94 (2d Cir. 2020)), and Congress has instructed that the ADA's "definition of disability . . . . shall be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A). Indeed, even "temporary injuries [are] actionable—for establishing an actual disability claim under the ADA." *Hamilton*, 3 F.4th at 94 (emphasis omitted).

Courts utilize a three-step approach for determining whether an individual has a disability for purposes of the ADA, a plaintiff must: (1) "show that []he suffers from a physical or mental impairment"; (2) "identify the activity claimed to be impaired and establish that it constitutes a 'major life activity'"; and (3) "show that h[is] impairment 'substantially limits' th[at] major life activity." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (citing *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998)).

Here, Plaintiff claims his impairments substantially limit his ability to see, to walk, to sit, and to work. (Dkt. No. 91, ¶¶ 15, 24). There is no dispute that seeing, walking, sitting, and working are major life activities.. 29 C.F.R. § 1630.2(i). However, Defendant argues that Plaintiff has failed to prove "a physical impairment," or that any impairment "substantially limits" his ability to see, walk, sit, or work.

> ### a.    Seeing

Plaintiff contends that he suffers from an injury to his vision that left his "eyes . . . heavily damaged," and explained that they "will not converge or come together" causing "blurred vision, double vision" and "blind spots." (Tr. 55, 132, 202–03, 205). The applicable regulations define a physical impairment as "[a]ny physiological disorder or condition . . . affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs . . . ." 24 C.F.R. § 100.201(a)(1). Plaintiff, however, presented no medical evidence diagnosing an injury to his eyes or his vision. As discussed, the bill of particulars, which contains an attorney's recitation of her understanding of Plaintiff's medical condition following the car accident is insufficient to show a physical impairment of Plaintiff's vision. While Plaintiff provided no specific evidence—or testimony—linking the two, the Court infers that the damage to Plaintiff's vision was a result, or part, of Plaintiff's "traumatic brain injury." "Although the Second Circuit has held that medical evidence is 'not always necessary' to establish that an impairment substantially limits major life activities, it has not ruled on whether such evidence is necessary to establish the existence of an impairment in the first instance." *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 610 (S.D.N.Y. 2016) (internal citation omitted) (quoting *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 43 (2d Cir. 2015)). The Court need not decide whether Plaintiff must present medical evidence to establish an impairment to his vision,

however, because Plaintiff has failed to prove by a preponderance of the evidence that his vision impairment is substantially limiting.

"'[S]ubstantially limit[s]' in the ADA's definition of 'disability' require[s] that an impairment 'prevent[ ] or severely restrict[ ]' an individual's major life activity. *Rodriguez*, 788 F.3d 31 at 43 (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)). A determination of whether an impairment substantially limits a major life activity requires "an individualized assessment." 29 C.F.R. §§ 1630.2(j)(1)(ii) & (iv). "Medical testimony may be helpful to show that an impairment is substantially limiting, but it is not always necessary." *See EEOC v. AutoZone, Inc.*, 630 F.3d 635, 643–44 (7th Cir. 2010). For example, "non-medical evidence that conveys, in detail, the substantially limiting nature of an impairment may be sufficient." *Rodriguez*, 788 F.3d at 44.

In *Capobianco v. City of New York*, 422 F.3d 47, 58 (2d Cir. 2005), the Second Circuit found the plaintiff, who had night blindness, had raised a material issue of fact regarding whether he was substantially limited in the major life activity of seeing where there was evidence in the record that: "night blindness affects only 1 in 10,000 people"; the plaintiff required "more than 100 times as much light to see as does a normally-sighted person"; that the plaintiff could not drive "at night or in dim light" (and that it was reasonable to infer "that 'the average person in the general population' can drive at night"); and the plaintiff could not "safely walk, run, or ride a bicycle outdoors at night, except in the most familiar and well-lit surroundings" and had "extreme difficulty finding a seat in a dark movie theater or restaurant." The Circuit concluded that a reasonable fact-finder could conclude "from this combination of circumstances, that Capobianco's night blindness significantly restricts the manner in which he can see as compared to the 'average person in the general population.'" *Id.* at 59.

34

Here, the evidence of Plaintiff's visual limitations is sparse and vague and suggests that Plaintiff's condition improved over time. Plaintiff testified that he needed prism glasses to read and write, but offered no description whatsoever—outside "blurry" and "double vision"—of the extent to which he could or could not see, including the extent to which his reading and writing are impaired, or of how his condition impaired his ability to read and write. In addition, Plaintiff testified that by November and December 2015, his vision "was better than" it was immediately after the accident, that his glasses prescription changed as he progressed. (Tr. 90–91, 117, 133). Moreover, while the Court has credited Plaintiff's testimony that he used prism glasses at times, there was conflicting credible testimony that he did not wear glasses, and the Court does not credit Plaintiff's testimony that he wore prism glasses most of the time or that his eyesight impaired his ability to walk. *See* Findings of Fact, supra Section II.B.2. Thus, while mindful of Congress's direction to construe the "definition of disability . . . in favor of broad coverage of individuals," 42 U.S.C. § 12102(4)(A), the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Plaintiff's ability to see is substantially limited. *See Skoric v. Vt. Country Store*, No. 17-cv-182, 2019 WL 7761727, at *13, 2019 U.S. Dist. LEXIS 226265, at *39 (D. Vt. Sept. 13, 2019) (granting summary judgment finding the plaintiff failed to present evidence that his "visual impairment constitutes a 'disability,'" where "the only measure of Plaintiff's visual impairments [were] his own statements that he has 'trouble seeing th[e] endless rows of tightly packed letters and numbers" on Defendant's order forms and his "contact lenses, that [he] need[s] to see where he go[es], work less well on seeing up close"); *see also Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 86, 94–95 (D. Conn. 2011) (finding the plaintiff, who had "convergence insufficiency," i.e., difficulty in visually focusing on close-in objects, and who testified that he struggles to read textbooks, used "reading strategies" to absorb

text, had difficulty grocery shopping, and avoided using computers, and whose doctor stated that he "has great difficulty 'reading' or test taking for more than 30 mins. at a time," requires breaks, and develops "double vision, head ache & eye strain if forced to go beyond 20–30 mins of test taking," failed to prove that he was substantially limited in seeing where the objective measures of the plaintiff's visual difficulties were within normal ranges and there was "no evidence that he struggles to read significantly more than the average person, and he has worked, studied, and participated in hobbies—without formal accommodations").

### b.   Walking

Plaintiff testified that his ability to walk was affected. (Tr. 55). The only evidence Plaintiff presented regarding a limitation in his ability to walk is that he "had a cane," (Tr. 63), and that he "didn't walk well without the glasses," (Tr. 204, 205). The Court, however, has not credited Plaintiff's testimony that he walked with a cane or needed prism glasses to walk during the relevant period, and there is no other competent evidence in the record regarding Plaintiff's ability to walk.[10] The doctor notes dated shortly after the accident state little more than: "Mr. Murphy was seen today in medical followup for injuries sustained in recent accident. He remains disabled from work and will be re-evaluated on September 2nd." (Pl.'s Ex. 1, at 44–46). These note provides no details regarding Plaintiff's injuries, condition, or limitations that would support a finding of disability. Accordingly, Plaintiff failed to show he is substantially limited in the major life activity of walking.

---

[10] The Bill of Particulars references Plaintiff's alleged inability to walk more than twenty minutes but as noted above, it is entitled to little weight as it was drafted by an attorney lacking any personal knowledge regarding Plaintiff's abilities. (Defs.' Ex. 3).

### c.    Sitting

Nor has Plaintiff presented evidence that he was substantially impaired in the major life activity of sitting. "If a plaintiff offers evidence that she cannot sit for a prolonged period of time, she may well be disabled under the ADA, depending on her specific factual circumstances." *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 69 (2d Cir. 2014). "[T]he inability to sit even for a prolonged period of time may be a disability depending on the totality of the circumstances." *Parada*, 753 F.3d at 70.

Here, Plaintiff's testified "sitting one place was so painful," and caused pain in his neck, back, hips, and legs. (Tr. 63). He would work for "an hour, hour and a half" and then take a "five, ten minute" break to "walk around," (Tr. 63, 90–91). Plaintiff testified that he has "spine issues." (Tr. 204). However, this testimony is not only vague—Plaintiff provides no factual details about any underlying spinal or hip injuries—but there is no medical evidence that might support or shed light on his testimony. The Court therefore concludes that, without more, Plaintiff's testimony that he can only sit for an hour or hour and a half at a time is too vague to support a finding that Plaintiff is substantially limited in the major life activity of sitting. *Cf. Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 502 (N.D.N.Y. 2004) (concluding that the plaintiff had raised a material issue of fact as to whether he was substantially limited in major life activity where the plaintiff's doctor indicated that the plaintiff was "able to stand, sit, or walk for, at most, 30 minutes at a time," explaining that "[c]learly these limitations exceed those that the average adult in the general population is subject to" (citing *EEOC v. Yellow Freight Sys., Inc.*, No. 98-cv-2270, 2002 WL 31011859, at *13, 2002 U.S. Dist. LEXIS 16826, at *40 (S.D.N.Y. Sept. 9, 2002) ("[C]ourts have generally found that the inability to sit for periods of an hour or less may constitute a substantial limitation on the ability to sit, while the ability to sit for periods longer than an hour does not."))).

### d.      Working

To the extent Plaintiff claims his impairments substantially limit his ability to work, he

fails to present evidence substantiating this claim. "[A] plaintiff alleging a work-related disability

must show that his condition precludes him from working in a *class or broad range of jobs*."

*Woolf*, 949 F.3d at 95 ((quoting *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019)).

Plaintiff offered no evidence showing that his visual, cognitive, or physical limitations precluded

him from working. To the contrary, he testified that he needed short, periodic breaks and to wear

prism glasses but was otherwise able to perform his own full-time job as well as part-time work

as a toll collector, (Tr. 90–91, 102, 209). *See Witchard v. Montefiore Med. Ctr.*, No. 05-cv-5957,

2009 WL 602884, at *12 (S.D.N.Y. Mar. 9, 2009) ("If Plaintiff's major life activity of seeing is

not substantially limited, then it follows that her major life activity of working is not

substantially limited.").

Having found that Plaintiff failed to show by a preponderance of the evidence that any

physical impairment, considered separately or together, substantially limits his ability to perform

a major life activity, the Court concludes that Plaintiff's ADA discrimination claim fails, and is

dismissed. As discussed further below, however, even assuming Plaintiff had established a

disability within the meaning of the ADA, any discrimination claim fails because he has failed to

sustain his burden of showing that that he was terminated because of disability discrimination.

### 2.      NYSHRL Disability Claim

### a.      Prima Facie Case of Discrimination

Plaintiff's claim for discrimination under the NYSHRL is governed by the same liability

standards, including the same *McDonnell Douglas* burden-shifting framework, as his ADA

claim. *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006). A crucial difference between the

two statutes, however, is that the NYSHRL's definition of "disability" is not limited to

impairments that "substantially limit[] one or more major life activities." Rather, the NYSHRL

only requires Plaintiff to show that he suffers from "[a] physical, mental, or medical impairment

resulting from anatomical, physiological, genetic, or neurological conditions that: (1) prevents

the exercise of a normal bodily function; or (2) is demonstrable by medically accepted clinical or

laboratory diagnostic techniques." N.Y. Exec. § 292(21); *see also McCowan v. HSBC Bank USA,*

*N.A.*, 689 F. Supp. 2d 390, 402 (E.D.N.Y. 2010) ("[U]nder state law, a disability need only be a

demonstrable impairment; it does not have to substantially limit a major life activity"). While

Plaintiff has not substantiated his claim of disability with hospital records or other medical

evidence specifically describing his condition, the Court credits his testimony that, during the

time period at issue in this case: he needed to wear special prescription prism glasses at times

during work to correct his vision; he attended regular chiropractic sessions to manage spinal

problems and pain arising from his accident; he experienced some level of cognitive difficulties;,

and he needed to take breaks from work as a result of ongoing pain. As described by Plaintiff,

the Court assumes that these conditions, while not necessarily substantially limiting, were

physical impairments sufficient to satisfy the NYSHRL's criteria for a disability. Further, it is

undisputed that Plaintiff was qualified to perform the essential functions of his job as a federal

lobbyist. Accordingly, the Court must consider whether Plaintiff satisfied the remaining element

of a prima facie case of disability discrimination, namely, that he suffered an adverse

employment action because of his disability. *Brady*, 531 F.3d at 134.

    Plaintiff's claim that his disability played a role in his termination from PEF is based

almost entirely on his own testimony that, between August 2015 and his December 2015

termination, he experienced significant disability-based harassment from Leo, Spence's Chief of Staff. *See* Findings of Fact, *supra* Sections II.B.2, 4.[11]

By contrast, Leo himself denied ever harassing Plaintiff on account of his disability, or even being aware that Plaintiff had been in a car accident or had a disability. (Tr. 449, 460, 466). He did acknowledge that he barred Plaintiff from attending PEF Executive Board meetings. (Tr. 454). However, he testified that he did so at Spence's direction due to Spence's belief that Plaintiff was frequently making derogatory comments about PEF and the Spence administration, and Spence's concerns that Plaintiff would undermine him by doing so in front of PEF elected officials. (Tr. 453–54). Spence's own testimony corroborated this explanation. (Tr. 579).

Virtually all other PEF witnesses, with the exception of Nikki Brate, testified that they never observed Leo harassing Plaintiff, and were not aware of any such harassment. Indeed, Brate did not testify that she witnessed Leo harass Plaintiff. Brate did, however, testify that Leo would often come to her office and complain about Plaintiff, including calling Plaintiff "retarded" and expressing annoyance that Plaintiff was missing work for physical therapy, and would tell her that he was going to Plaintiff's office to "terrorize" Plaintiff. (Tr. 314–15, 320). The Court does not find Brate's testimony credible. The relationship between Leo and Brate was rife with conflict; Brate has filed charges against Leo and Spence, and they have filed charges against her. (Tr. 326). At trial, Brate acknowledged that a committee found that she had threatened Leo with the loss of his PEF position by saying she would defund it, and falsely accused Leo of sexual harassment. (Tr. 335).

---

[11] Leo was Plaintiff's direct supervisor from August 2015, when the Spence Administration took power and removed Plaintiff's supervisor, until late September 2015, when Amorosi was hired as PEF's legislative director and took over as Plaintiff's supervisor. (Tr. 61–62).

Plaintiff also testified that he reported Leo's disability-based harassment of him to Amorosi. (Tr. 66, 80). However, in his own account of their conversation, Amorosi explained that Plaintiff complained only about Leo stripping him of job responsibilities, not any bullying or harassment, and that Plaintiff did not suggest that Leo's actions were tied to Plaintiff's disability. (Tr. 221–22, 249–50). The account of the conversation that Amorosi gave at trial is consistent with the account he gave in his memo to Leo shortly before the December 3 counseling session that resulted in Plaintiff's termination, and the Court has credited Amorosi's account. (Defs.' Ex. 25 at 1).

Moreover, even crediting Plaintiff's testimony that Leo harassed him when they worked in the same building, Plaintiff's testimony that Leo continued to frequently harass Plaintiff in person after Plaintiff was reassigned to the downtown Albany legislative office is inconsistent with the testimony of other witnesses who worked in that office, all of whom testified that Leo only visited that office very occasionally after Amorosi was hired in September 2015. (Tr. 260–61).

However, considering all of the foregoing evidence and testimony, and notwithstanding some inconsistencies and implausibilities in Plaintiff's testimony and the lack of compelling corroborating evidence for his assertions, the Court credits Plaintiff's testimony that he experienced some level of disability-based harassment at Leo's hands, at least when they worked in the same building before Plaintiff's transfer to the downtown Albany legislative office, and possibly after that transfer with less frequency. First, Plaintiff's account of the derisive nature of Leo's harassment and treatment of him is somewhat supported by Jennifer Seamon's notes from the December 3 counseling session. These notes record Leo making derogatory and antagonistic references to Plaintiff's need for physical therapy that are consistent with Plaintiff's claim about

Leo's insulting comments toward Plaintiff's physical condition. (Defs.' Ex. 20, at 1–3 ("[W]here are you and what are you doing most of the day? Doing Physical Therapy? . . . Okay, describe your duties here to me other than physical therapy? . . . Okay, from now on, I want to know and document your work, every minute of his day, including physical therapy.")). Second, the Court finds aspects of Leo's testimony to be unworthy of belief. For example, Leo claimed not to know that Plaintiff had been in a car accident until he was terminated and to have only learned minutes before the December 3 counseling session that Plaintiff was regularly leaving work to attend physical therapy, despite the fact that he was Plaintiff's direct supervisor in July, August, and September 2015, as well as record evidence that, he was informed in an email on October 2, 2015 that Plaintiff was out of the office for physical therapy in connection with a car accident. (Pl.'s Ex. 32). As Plaintiff has presented some credible evidence of disability-based animus by Leo, and Leo was a participant in the meeting on December 3, 2015 that immediately preceded Plaintiff's termination, the Court concludes Plaintiff has satisfied his "not onerous" and "minimal" burden of establishing a prima facie case of disability discrimination. *Scaria v. Rubin*, 117 F.3d 652, 653 (2d Cir.1997) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

### b.    Legitimate, Nondiscriminatory Reasons for Termination

"Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the [employment action]." *Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 140 (2d Cir. 2008)). Defendants have presented evidence that Spence terminated Plaintiff: (1) because he attended the December 1 and 2, 2015 Executive Board meeting after having been told not to attend and was "badmouthing" the Spence administration; (2) based on Plaintiff's "combative" "defensive, upset, . . . hostile, confrontational," and insubordinate conduct at the December 3,

2015 meeting, including his shrug toward Banks during the meeting, signaling to Leo and Kerner not only that Plaintiff remained allied with Banks, but also that Plaintiff disdained them and dismissed their concerns about his behavior; and (3) based on Plaintiff's absences from the workplace. These reasons are legitimate, nondiscriminatory reasons for terminating employment. *See Hartley v. Rubio*, 785 F. Supp. 2d 165, 178–79 (S.D.N.Y. 2011) ("It is well-settled that an employer may permissibly terminate an employee based on inappropriate comments, perceived insubordination, or disruptive behavior in the workplace." (citing cases)); *Henny v. New York State*, 842 F. Supp. 2d 530, 554 (S.D.N.Y. 2012) ("Plaintiff's lateness and absences certainly suffice to establish a legitimate, non-discriminatory reason for her treatment.").

### c.    Pretext for Discrimination

Once a defendant establishes legitimate, nondiscriminatory reasons for an adverse action, the burden returns to the plaintiff to demonstrate that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *see Ruiz*, 609 F.3d at 492 (explaining that "the burden returns to the plaintiff to show that the real reason for [the adverse employment action] was" discrimination (citing *Holcomb*, 521 F.3d at 141)). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* "Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)

(quoting *Burdine*, 450 U.S. at 253); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446–47 (2d Cir. 1999) ("The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination.").

As discussed below, the Court finds that although Defendants have offered changing and inconsistent explanations for Plaintiff's termination, Plaintiff has failed to prove that Defendants terminated him because of his disability. Given the evidence of the politically charged atmosphere at PEF following Spence's election, the Court attributes Defendants' changing explanations and inconsistencies not to an attempt to conceal animus toward Plaintiff based on his disability but to an effort to control the "political fallout" and prevent Plaintiff's termination from being used against the Spence administration by his opponents. (Tr. 463).

It is undisputed that Spence initiated the chain of events that led to Plaintiff's termination by calling Kerner and Leo on December 3, 2015 in the morning to tell them that he wanted Plaintiff fired. (Tr. 403, 457, 584). There is, however, conflicting evidence regarding one of the reasons Spence gave for making that phone call and wanting to terminate Plaintiff's employment, namely, Plaintiff's alleged attendance of the December 1 and 2, 2015 Executive Board meeting in violation of Spence's order. Plaintiff flatly denies attending that meeting, (Tr. 181), Kerner made no mention of Plaintiff's attendance of that meeting in his testimony about the morning phone call with Spence, and Spence testified that he saw Plaintiff "at the Desmond," despite the fact that the meeting was held at the Hilton Albany. (Tr. 580, 607–08). Moreover, the notes from the December 3rd meeting refer to Plaintiff's alleged inability to "take direction," (Defs.' Ex. 20, at 2), but contain no reference to the December Executive Board meeting. Indeed, not one witness testified that Plaintiff's attendance of the December Executive

Board meeting was raised during the counseling meeting and this issue is not mentioned anywhere in Leo's post-termination memo. (Defs.' Ex. 25). The Court, however, finds no evidence that Defendants' reliance on Plaintiff's alleged attendance of the December 2015 Executive Board meeting is a pretext for disability discrimination.

Spence's other reasons for initiating the phone call with Kerner and Leo and wanting to terminate Plaintiff, are well-supported. Spence was in the midst of contending with various crises, including the lack of a contract with the state, and two of his vice presidents, Nikki Brate and Peter Banks had "turned on" him, (Tr. 403–04, 561–62, 583, 620), and the fact that "freaking John Murphy's name ke[pt] coming up," (Tr. 583), which "aggravate[ed]" Spence, who had "had enough of" Plaintiff's "crap" and his "speaking bad" about Spence and the union, (Tr. 404, *see also* Tr. 618), and prompted Spence to call Kerner and Leo and tell them he wanted Plaintiff terminated. The politically charged atmosphere of PEF was undisputed by every witness questioned on the issue, except Plaintiff, who denied that PEF was political and downplayed the notion that presidential transitions could be political. (Tr. 44, 47, 49). The Court does not credit Plaintiff's testimony on this point. The distrust and hate on both sides of the political factions in PEF was manifest in both the content of the witnesses' testimony and manner in which the witnesses at trial testified. (Tr. 574 (Spence testifying that in the fall of 2015, Brate referred to him, in print, as "No-brain" instead of Wayne), 388 (Kerner testifying that "starting in 2015 when I got there, in house so to speak, Nikki Brate had already started fighting with Wayne Spence, Peter Banks started arguing with President Spence, and it was really over a purchase card that they were not allowed to have"), 329 (Brate testifying about a "report of an appointed committee [member] from Wayne Spence . . . who has posted on Facebook hate comments about" her)).

While Plaintiff denies ever disparaging Spence or the union, everyone who worked with him in PEF's legislative office after he was assigned there—Amorosi, Scott Laurey, and Danielle Little-Thompson—testified that they heard Plaintiff make comments that PEF was "fucked up" and "going to hell in a handbasket," and that the Spence administration was "clueless" and could "fuck up a free lunch." (Tr. 231, 520–21, 545–46; *see also* Defs.' Ex. 25). Spence, Leo, and Kerner testified to hearing from others within PEF that Plaintiff was speaking critically about the Spence administration. (Tr. 402, 453, 582).

In addition, Plaintiff's insubordinate conduct during the December 3 counseling meeting, which cemented Spence's decision to terminate him, is well-supported. Even if Plaintiff's anger at the manner of Leo's antagonistic and circular questioning during the counseling was justified, Plaintiff's responses, as corroborated by Kerner, Leo, Amorosi, Seamon, and the documentary evidence, principally consisted of accusations toward Leo, retorts, and dismissals of the concerns raised, (*see, e.g.*, Defs.' Ex. 20, at 1–3 (Plaintiff responding: "You have attacked me since you have come on staff," "He . . . has had it out for me from the beginning," "Unbelievable," and "No way . . . People talk, I can't help that"). Further, it is undisputed that Plaintiff shrugged toward Banks when Banks looked in at the end of the meeting, signaling to Kerner and Leo his alliance with Banks, whom the Spence administration viewed as an "insurgent," and indifference toward the concerns that had been raised. Plaintiff's conduct, which Kerner termed "negative," "demeaning," "disrespectful," and "insubordinate," led Kerner to recommend to Spence, Plaintiff's immediate termination. (Tr. 413–14).[12] Worried about "political fallout," Leo, however, continued to argue against termination and asked that Plaintiff be given an additional

---

[12] Kerner also testified that PEF could not have "no show" employees. (Tr. 414). There is no evidence, however, that this concern informed Spence's decision to terminate Plaintiff.

30 days to "change his ways." (Tr. 414–15, 463). Spence's response to Kerner and Leo was "we should have just fired him earlier when I told you" and a direction to terminate Plaintiff. (Tr. 415, 463, 590). Given this evidence, none of which concerns Plaintiff's disability, Plaintiff has failed to satisfy his burden of showing that disability discrimination was a "but-for" cause of his termination. *Natofsky*, 921 F.3d at 348.

Even assuming, as Plaintiff argues, that a cat's paw theory is legally viable under the NYSHRL,[13] Plaintiff has produced no evidence or testimony even arguably suggesting that such manipulation by Leo occurred, or that Leo's opinion of Plaintiff's disability played any significant role in Spence's decision. To the contrary, all the record evidence, including Spence's own testimony and the documentary evidence, suggests that: (1) Spence's decision to fire Plaintiff was largely motivated by his own frustration with Plaintiff's alleged "badmouthing" of the union and his administration, which he considered "insubordinate"; (2) Kerner and Leo initially convinced Spence to allow them the opportunity to have a counseling session with Plaintiff rather than terminate him, testimony that is corroborated by Leo's post-termination memo, (*see* Defs.' Ex. 24 ("His continued unprofessional behavior is what transitioned the counseling towards a termination.")); and (3) even after that counseling session, Leo—again, the only PEF official who displayed any animus toward Plaintiff's disability—advised Spence not to fire Plaintiff, and to give him an opportunity to correct his behavior, testimony that both Spence and Kerner corroborated.

---

[13] In a memorandum submitted during trial in connection with their motion for a directed verdict, Defendants argue that, under *Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019) and *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019), establishing causation through a "cat's paw" theory is insufficient where, as with the ADA and (presumably) the NYSHRL, a "but for" rather than "mixed motivation" causation standard applies. The Court need not reach this question, as it finds that even if a cat's paw theory is a legally viable way for Plaintiff to prove his claim, he has not proven such a theory here.

Finally, Plaintiff's absence from the office was cited consistently at trial and is well-documented. "Where the employer was aware that an employee's absences were related to a disability . . . the employee's attendance record may be an impermissible pretext for the employee's disability." *Morris v. City of New York*, 153 F. Supp. 2d 494, 502 (S.D.N.Y. 2001) (collecting cases). Here, however, the proof at trial showed that many of Plaintiff's absences from the office were unrelated to any disability. For example, Amorosi testified that while he was aware Plaintiff had medical appointments three or four days each week, necessitating his absence from the office and late arrival, Plaintiff typically arrived to work after 12:00 p.m. and left before 6:30 p.m. (Tr. 234, 245). There is no evidence that Plaintiff's condition necessitated either a late arrival on a daily basis or a reduced workday. Plaintiff only testified that he "worked from home on his PT days." (Tr. 89). Although Plaintiff denied his late arrivals, the Court does not find that testimony credible. Both Amorosi and Leo testified that they had difficulty finding Plaintiff on a regular basis and Leo corroborated Amorosi's testimony that Amorosi had raised Plaintiff's absence from the office as a concern shortly after his arrival. (Tr. 223, 450–51). Moreover, there is no evidence that any accommodation Plaintiff may have had enabled him to work from home authorized a reduced workday or absence from the office. The Court therefore finds Plaintiff has failed to prove that his absence from the workplace is a pretext for disability discrimination. *See Mayo v. Columbia Univ.*, No. 01-cv-2002, 2003 WL 1824628, at *7, , 2003 U.S. Dist. LEXIS 5639, at *22–23 (S.D.N.Y. Apr. 7, 2003) (rejecting the plaintiff's claim of pretext where the plaintiff "had a history of unplanned absences[, failed] to communicate with his supervisors[,]" and failed to submit progress reports on his condition and other documentation regarding his medical leave in violation of a "return to work agreement"); *see also Dooley v. JetBlue Airways Corp.*, 751 F. App'x 52, 54 (2d Cir. 2018) (summary order)

("Although Dooley disputes JetBlue's characterization of these absences and the types of corroboration the company insisted on, in the absence of evidence that these decisions were motivated by disability discrimination, we will not 'act as a super personnel department that second guesses [JetBlue's] business judgments.'" (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)).

While the reasons for Plaintiff's termination shifted and changed,[14] and there were reasons to question the credibility of some of the key fact witnesses, the Court does not find that the termination was discriminatory. *See Reeves*, 530 U.S. at 147–48 (noting that while "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory"). However inconsistent the record may be as to the specific reasons for Plaintiff's termination, the overarching concern that drove Spence's decision to terminate Plaintiff is largely uncontroverted: Spence was operating in a politically charged atmosphere, was aggravated by reports that Plaintiff was "badmouthing" him and his administration, and felt that Plaintiff had shown through his conduct, which Spence had observed personally, that Plaintiff "no loyalty" to PEF. Further, the evidence showed that Defendants were very concerned about "the political fallout" that might result from Plaintiff's termination, (Tr. 462, Tr. 583 (Kerner testifying that he counseled Spence against termination, explaining that Plaintiff "was liked by . . . some of the members on the executive board" and that

---

[14] *See, e.g.*, Defs.' Ex. 24 (Leo's post-termination memorandum with "historical overview" of the events leading to Plaintiff's termination, included claims of harassment by an employee in the Latham office, which was only minimally referenced at trial and never in the context of his termination, but had no reference to Plaintiff's attendance of the December 2015 Executive Board meeting or Plaintiff's insubordinate behavior and reaction to Banks at the December 3 counseling meeting), and Plaintiff's supposed attendance of the December Executive Board meeting was largely unsupported by the record.

"the optics" of termination "would not be a good thing."); Defs.' Ex. 24), and that they took steps before and after his termination to document Plaintiff's conduct extensively, including citing many reasons that were never mentioned to Plaintiff on in any discussion of his termination, not to conceal disability discrimination, but so that Plaintiff's termination could not be used by Spence's opponents, "to their political advantage," (Tr. 462; Defs.' Exs. 24, 25). *See Fisher v. Vassar Coll.*, 114 F.3d1332, 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent"). Thus, the Court finds that Plaintiff has failed to prove that Defendants "intentionally discriminated against the plaintiff" because of his disability and that disability discrimination was a but-for cause of his termination. *Burdine*, 450 U.S. at 253; *see also Goonewardena v. N. Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 340–43 (finding that even though there was some evidence at trial of procedural irregularities and discrepancies in paperwork leading to termination, the plaintiff failed to carry "his burden of demonstrating that Defendants' legitimate, non-discriminatory reasons for his termination were" a pretext for discrimination). Accordingly, Plaintiff's NYSHRL disability discrimination claim is dismissed.

### D.      Retaliation

Plaintiff claims Defendants terminated his employment in retaliation for his complaints about Leo's disability-based harassment. As with claims for discrimination, ADA "[c]laims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Under this framework, "a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of [retaliation]; it is then the defendant's burden to proffer a legitimate nondiscriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful [retaliation]." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244,

251 (2d Cir. 2014) (citing *Bickerstaff*, 196 F.3d at 446). Plaintiff may establish a prima facie case

of retaliation by showing (1) that he engaged in protected activity under the ADA; (2) PEF was

aware of this activity; (3) PEF took an adverse employment action against Plaintiff; and (4) a

causal connection exists between the adverse employment action and the protected activity. *See*

*Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *Treglia*, 313 F.3d at 719. While a

but-for causation standard applies, proof of such causation "can be shown either: (1) indirectly,

by showing that the protected activity was followed closely by discriminatory treatment, or

through other circumstantial evidence such as disparate treatment of fellow employees who

engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed

against the plaintiff by [the defendant]." *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d

470, 485 (S.D.N.Y. 2013) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.

2000)); *see also see Zann Kwan*, 737 F.3d at 845 ("[T]he but-for causation standard does not

alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary

judgment or at trial indirectly through temporal proximity."). Retaliation claims brought under

the NYSHRL are governed by the same standards as ADA retaliation claims. *Treglia*, 313 F.3d

at 719.

Defendants argue that Plaintiff has failed to establish a prima facie case of retaliation

because he failed to prove the first or second elements—that he engaged in protected conduct

and that PEF was aware of that conduct. The Court agrees.

Under the ADA, "[r]equests for disability accommodation and complaints, whether

formal or informal, about working conditions related to one's alleged disability are protected

activities." *Gorbea v. Verizon N.Y., Inc.*, No. 11-cv-3758, 2014 WL 917198, at *11, 2014 U.S.

Dist. LEXIS 31225, at *38 (E.D.N.Y. Mar. 10, 2014); *see also Goonan*, 916 F. Supp. 2d at 485.

Similarly, the NYSHRL makes it unlawful for an employer to retaliate against an employee because he "has opposed any practices forbidden under this article or because . . . [he] has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7). Thus, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (internal citation omitted). "An employee engages in a protected activity when []he complains of an employment practice that [he] reasonably believes violates the law." *Id.* (quoting *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011)). "As to the second element, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at" prohibited conduct. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)

Here, Plaintiff claims that PEF terminated him in retaliation for lodging complaints about Leo's disability-based harassment and mistreatment of him. Plaintiff testified that: (1) he raised his complaints to Amorosi in late September, shortly after Amorosi became his supervisor; (2) he raised his complaints to PEF Vice Presidents Nikki Brate and Peter Banks after they approached him; and (3) he raised his complaints at the December 3 counseling session and, at the end of the meeting, lodged a "formal" complaint, causing Kerner to immediately end the meeting. As set forth above, the Court has not credited Plaintiff's claim that he reported Leo's harassment to Amorosi. *See* Findings of Fact, *supra* Section II.B.4.. The Court therefore addresses Plaintiff's remaining claims of protected conduct.

### 1.    Complaints to Nikki Brate and Peter Banks

Plaintiff testified that he told Nikki Brate and Peter Banks, two of PEF's three Vice-Presidents, that he "was being harassed for [his] vision" and "because of [his] handicap" and that

he "was scared." (Tr. 80). Plaintiff provided no specifics regarding where or when this conversation took place. Banks did not testify at trial, and nothing in the record aside from Brate's testimony (discussed below) corroborates Plaintiff's testimony that Banks was ever aware of Plaintiff's complaints of disability-based harassment. Brate did testify that Plaintiff discussed Leo's behavior with her in her office while Plaintiff worked at PEF's headquarters, before he was relocated to the Albany office. (Tr. 312). She testified that she discussed Plaintiff's issues with Banks and PEF's Secretary-Treasurer, and that they attempted to raise their concerns with Spence and the PEF trustees, but that Spence refused to meet with them and no action was taken to address Leo's behavior. (Tr. 320–21). When asked specifically about what concerns she raised to others at PEF, Brate answered that she was concerned that Plaintiff was being forced to work in a "hostile" environment, that he was afraid to go to physical therapy because Leo would give him a "hard time," and that Leo did not believe Plaintiff's medical condition was real or that he genuinely needed physical therapy. (Tr. 318, 361–62).

Brate however, was vague about when she raised these concerns, and what specifically she told whom. Her testimony suggests that Plaintiff raised these concerns to her in person while they were both working at PEF's headquarters; nothing in her testimony suggests that she raised them to anyone else at PEF, after Plaintiff was transferred to PEF's legislative office, which occurred months before he was terminated. Moreover, the only document reflecting Brate raising any concerns about Plaintiff to others at PEF—an email in which Brate told Spence and others that Leo "himself also told me that he would just go to John Murphy['s] office to upset him and make him nervous," which was not admitted into evidence, but which Brate was questioned about—is dated January 29, 2016, nearly two months *after* Plaintiff's termination, and makes no mention of whether Brate felt that Leo's behavior was tied to Plaintiff's disability.

Furthermore, the Court must evaluate the credibility of Brate's testimony, and her version of events, in the context of her history as an officer of PEF and her relationship with Spence and the Defendants in this case. Specifically, it is clear that, from virtually the moment the Spence administration took power following the 2015 election, the relationship between Brate and Banks on the one hand, and Spence and his administration on the other, was (and remains) hostile. The relationship involved not only deeply combative personal interactions, but formal ethics complaints filed by both sides against the other. (Tr. 326–27, 563–64). Brate herself was investigated and disciplined by a PEF committee for a series of alleged improprieties that included, among other things, making false accusations against other PEF members, ordering another PEF employee to destroy records, threatening Leo with the loss of his position, and maintaining falsehoods regarding an interaction with Leo even after being presented with a transcript or recording disproving her version of events. (Tr. 564–66). These findings resulted in Brate being stripped of her Vice-President position and temporarily barred from running for office. (Tr. 566–67). Brate, of course, disputes the committee's findings, (Tr. 334), and choosing between their conflicting perspectives is far outside the Court's role in this trial.

For purposes of this trial, the Court finds that in light of Brate's documented history of being penalized by PEF for behavior involving dishonesty; her evasive, hostile and defensive demeanor while testifying, (*see, e.g.*, Tr. 349 (Brate responding "No." to the question "And you blame President Spence for all of this, don't you?" but then stating in response to the follow up question "Who do you blame?," that she "blame[s] Wayne [Spence]")); and the vagueness of her testimony regarding what specifically she told others at PEF regarding Plaintiff's complaints and

when,[15] Brate's testimony concerning Plaintiff's complaints of disability discrimination and that she attempted to raise Plaintiff's complaints on his behalf are not credible.

### 2.    Complaints During December 3, 2015 Counseling Meeting

Plaintiff testified that, at the beginning of the counseling session, he complained that Leo had been "bullying" and "harassing" him based on his disabilities. The notes from the December 3 meeting reflect that Plaintiff complained that Leo was "bullying" him, (Defs.' Ex. 20, at 1), and Plaintiff testified that he also complained that Leo was "harassing" him, (Tr. 85). Although Plaintiff did not expressly say Leo was bullying and harassing him about his disability, because Plaintiff's complaint was in direct response to Leo's antagonistic questioning, which included questioning about where Plaintiff was and what Plaintiff was "doing most of the day. . . Doing Physical Therapy?" (Defs.' Ex. 20, at 1), the Court must consider whether, as Plaintiff argues, Plaintiff was complaining about disability discrimination. (*See* Dkt. No. 91, ¶ 65 (Plaintiff arguing that "[a]ny reasonable person would interpret this statement, in response to a question regarding someone with a serious medical condition, as a complaint of discrimination")).

---

[15] The following excerpt is an example of Brate's evasive and vague testimony:

| | |
|---|---|
| THE COURT: | Okay. Ms. Brate, I have some questions. What exactly were the concerns you raised with others at PEF about how Mr. Murphy was treated? |
| BRATE: | I saw, with what Chris Leo did, you know, stalking his office, eavesdropping when, when Mr. Murphy would come in to talk to vice presidents. |
| THE COURT: | And now I'm asking about, what did you tell other people, what were the concerns you raised with other people? |
| BRATE: | The concern that I felt, and I couldn't really say this because I felt it was inappropriate, I thought he was disabled, that was my thing, I thought he – |
| THE COURT: | But I'm asking what you told people, what were the concerns you had about how Mr. Murphy was treated? |
| BRATE: | I felt that he was forced to work in a hostile work environment and I was a little concerned about his mental health, to be honest with you. |

(Tr. 361).

Plaintiff's physical therapy attendance, time off for medical appointments, and "FMLA paperwork" were referred to at the meeting, but having considered all the evidence, the Court finds that in asserting that Leo was "bullying" and "harassing" him, Plaintiff was complaining about Leo's antagonistic treatment of him, not disability discrimination or harassment for attending physical therapy. The testimony and meeting notes show that the bulk of the conversation concerned Plaintiff's "speaking out," "talking," and "saying things" that Leo and Kerner believed Plaintiff "should not be," such as talking about employees who left and telling others that Spence and Leo are not happy with certain individuals. Indeed, Plaintiff immediately began complaining about Leo's treatment of him in response to Leo's first question—*before* Leo referenced physical therapy. (*See* Defs.' Ex. 20, at 1 (notes reflecting that Leo began the meeting by saying: "John . . . . You have been speaking out in ways you should not be . . . . Have you been . . . saying things such as why Susan Mitnick left? Elizabeth Hough?" and that Plaintiff responded: "You have attacked me since you have come on staff.")). Plaintiff's complaint about bullying and harassment followed Leo's second set of questions:

Leo:        How about you talking to Dee Dodson at a PAC meeting? Jim
            Kemmenash?? Telling people that he is not too happy here??? That
            Wayne and myself are not too happy with him?? And, of course,
            something else now: where are you and what are you doing most
            of the day? Doing physical therapy?

Murphy:     This is bullying [and harassment] and you've treated me like this
            from the day you started.

(Defs.' Ex. 20, at 1; Tr. 85). When viewed in isolation, Plaintiff's complaint of bullying and harassment may be read to suggest Plaintiff believed he was complaining about harassment. While this was sufficient at the summary judgment stage, having now considered the testimony of five witnesses as to the content of meeting, the Court is not persuaded that Plaintiff was complaining about disability discrimination. Rather, the

record shows that Plaintiff was complaining about Leo's hostile treatment of him generally, but not about disability discrimination. Indeed, Plaintiff's general use of "bullying" and "harassment" and other complaints about Leo during the meeting, including "You have attacked me since you have come on staff" and "He. . . has had it out for me from the beginning . . . I have phone calls from him during the day . . . he leaves no messages," (Def.'s Ex. 20, at 1–2), support the finding that Plaintiff was complaining about Leo's treatment of him, but not about disability discrimination. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's protected characteristic."); *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (explaining that the civil rights laws do "not establish a 'general civility code' for the American workplace"). Thus, the Court finds Plaintiff did not engage in protected activity when he complained of bullying and harassment at the December 3 meeting. For the same reasons, the Court likewise concludes that even if this were "protected activity," there is nothing in his complaint of "bullying" and "harassment" that could reasonably have led Defendants to understand Plaintiff was complaining of disability discrimination. *See Galdieri-Ambrosini*, 136 F.3d at 292 ("Ambrosini's complaints to Simon and Chiaro did not state that Ambrosini viewed Simon's actions as based on her gender, and there was nothing in her protests that could reasonably have led National Realty to understand that that was the nature of her objections.").

Finally, Plaintiff's claim that he made a formal, unambiguous complaint of disability discrimination near the end of the counseling session is without any record support beyond Plaintiff's own testimony. Leo, Kerner, Amorosi, and Seamon, all of whom attended the

December 3 meeting, testified consistently that Plaintiff made no such complaint. The notes from the meeting support this account of events. While the Court identified credibility issues with Leo and Seamon's testimony—specifically, that Leo's purported lack of knowledge of Plaintiff's car accident was not credible in view of the documentary evidence and that Seamon was evasive in her testimony about Plaintiff's communication with HR—their testimony about the December 3 meeting was consistent with Kerner and Amorosi's testimony. Notably, Amorosi no longer works for PEF and the Court found the entirety of his testimony credible. Thus, the Court does not credit Plaintiff's testimony that he made a formal complaint of disability near the end of the December 3 meeting.

Because, on this record, Plaintiff has not met his burden of proving by a preponderance of the evidence that he engaged in any protected activity or that Defendants were aware of his protected activity, he has not established a prima facie case for retaliation under either the ADA or the NYSHRL, and his retaliation claim under both statutes must be dismissed.

### E.   New York State Human Rights Law Claims against the Individual Defendants

Because Plaintiff has not established a primary violation of the NYSHRL by PEF, any aiding-and-abetting claims against the individual Defendants must be dismissed as well.

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Clerk is directed to enter Judgment in favor of Defendants New York State Public Employees Federation, Christopher Leo, Todd Kerner, and Gregory Amorosi; and it is further

**ORDERED** that the Clerk is directed to close this case.

Dated:  September 19, 2022
         Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge